# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

P.R., a minor, by and through, London Reed, Guardian and Next Friend; H.M., a minor, by and through, Travon L. Mccall, Guardian and Next Friend; C.W., a minor, by and through, Princess Vaughn,, Guardian and Next Friend; R.S., a minor, by and through, Octivita Smith, Guardian and Next Friend; I.J., a minor, by and through, Ruby Washington, Guardian and Next Friend; N.S., a minor, by and through, Erick Weathersby, Guardian and Next Friend; P.L., a minor, by and through, Tynecia Kelly, Guardian and Next Friend; C.T., a minor, by and through, Grace Carnes, Guardian and Next Friend; S.C., a minor, by and through, Shyla Robinson, Guardian and Next Friend; M.C., a minor, by and through, Crystal D Chancellor, Guardian and Next Friend; M.W., a minor, by and through, Patrick Wright, Guardian and Next Friend; F.B., a minor, by and through, Freddric Brandon, Guardian and Next Friend; M.W., a minor, by and through, Princess Vaughn, Guardian and Next Friend; B.P., a minor, by and through, Quantia Pendleton, Guardian and Next Friend; A.W., a minor, by and through, Tayler Boggans, Guardian and Next Friend; P.M., a minor, by and through, Travon L Mccall, Guardian and Next Friend; A.K., a minor, by and through, Adreaun Teshonn Keyes, Guardian and Next Friend; T.O., a minor, by and through, Marquetta Williams, Guardian and Next Friend; M.H., a minor, by and through, Chaprice Holmes, Guardian and Next Friend; A.R., a minor, by and through, Ayla Reed, Guardian and Next Friend; J.G., a minor, by and through, Arlandria T Taylor-Gilbert, Guardian and Next Friend; K.Y., a minor, by and through, Danielle

Civil No.  3:23-cv-243-CWR-LGI

1

Thomas, Guardian and Next Friend; C.S., a minor, by and through, Venesha Shavers, Guardian and Next Friend; Z.C., a minor, by and through, Christopher K Carter, Guardian and Next Friend; M.S., a minor, by and through, Shunketta Mccool, Guardian and Next Friend; E.H., a minor, by and through, Rachel Wright, Guardian and Next Friend; D.W., a minor, by and through, Catina L. Henderson, Guardian and Next Friend; J.B., a minor, by and through, Debra Gates, Guardian and Next Friend; A.R., a minor, by and through, Arnisha Taylor, Guardian and Next Friend; K.W., a minor, by and through, Kristy Watters, Guardian and Next Friend; J.T., a minor, by and through, Patia Terry, Guardian and Next Friend; A.W., a minor, by and through, Tayler Boggans, Guardian and Next Friend; T.C., a minor, by and through, Tommie Lee Course, Guardian and Next Friend; T.C., a minor, by and through, Tommie Lee Course, Guardian and Next Friend; T.C., a minor, by and through, Tommie Lee Course, Guardian and Next Friend; K.S., a minor, by and through, Jakara Reed, Guardian and Next Friend; D.O., a minor, by and through, Jamescia S Orey, Guardian and Next Friend; A.T., a minor, by and through, Grace Carnes, Guardian and Next Friend; J.O., a minor, by and through, Jalissa J Cattenhead, Guardian and Next Friend; T.W., a minor, by and through, Princess Vaughn, Guardian and Next Friend; K.R., a minor, by and through, Olexcess D Reed, Guardian and Next Friend; K.S., a minor, by and through, Chiquita L Weathers, Guardian and Next Friend; M.R., a minor, by and through, Krystie Roberts, Guardian and Next Friend; J.O., a minor, by and through, Geneiece O'Quinn, Guardian and Next Friend; J.W., a minor, by and through, Montrisa West, Guardian and Next Friend; M.A., a minor, by and through, Jennifer Berry, Guardian

and Next Friend; J.S., a minor, by and through, Brittany Horne, Guardian and Next Friend; J.N., a minor, by and through, Brandy Nichols, Guardian and Next Friend; J.N., a minor, by and through, Brandy Nichols, Guardian and Next Friend; K.M., a minor, by and through, Karina McLaurin, Guardian and Next Friend; E.R., a minor, by and through, Tabitha Davis, Guardian and Next Friend; J.W., a minor, by and through, Tommie Lee Course, Guardian and Next Friend; J.F., a minor, by and through, Lloydrina Smith-fortner, Guardian and Next Friend; N.G., a minor, by and through, Marquesha Chambers, Guardian and Next Friend; N.M., a minor, by and through, Shemika Moore, Guardian and Next Friend; G.L., a minor, by and through, Amanda Williams, Guardian and Next Friend; A.F., a minor, by and through, Daphane D Figures, Guardian and Next Friend; A.W., a minor, by and through, Melissa Odom, Guardian and Next Friend; C.W., a minor, by and through, Catina L. Henderson, Guardian and Next Friend; A.C., a minor, by and through, Dominique Marshall, Guardian and Next Friend; C.H., a minor, by and through, Jalyn Dixon, Guardian and Next Friend; C.M., a minor, by and through, Lakesha Mcdonald, Guardian and Next Friend; K.W., a minor, by and through, Kawquia Scott, Guardian and Next Friend; K.J., a minor, by and through, SherLonda Johnson, Guardian and Next Friend; J.C., a minor, by and through, Tiffany Crook, Guardian and Next Friend; J.P., a minor, by and through, Ruby Pugh, Guardian and Next Friend; C.R., a minor, by and through, Charlena E Robinson, Guardian and Next Friend; K.W., a minor, by and through, Chiquita L Weathers, Guardian and Next Friend; C.B., a minor, by and through, Joseph M Bennett, Guardian and Next Friend; D.F., a minor, by and through, Drusilla Hicks, Guardian and Next

Friend; D.R., a minor, by and through, Ayla Reed,
Guardian and Next Friend; T.G., a minor, by and
through, Tawaine Garner, Guardian and Next
Friend; C.A., a minor, by and through, Tierra
Adams, Guardian and Next Friend; M.J., a minor,
by and through, Markiesha Earley, Guardian and
Next Friend; M.G., a minor, by and through,
Tywanna Grice, Guardian and Next Friend; K.M.,
a minor, by and through, Victoria R Collins,
Guardian and Next Friend; K.O., a minor, by and
through, Josephine Montgomery, Guardian and
Next Friend; C.G., a minor, by and through,
Cathy Gates, Guardian and Next Friend; C.W., a
minor, by and through, Erma A Withers,
Guardian and Next Friend; T.H., a minor, by and
through, Chanda Hicks, Guardian and Next
Friend; D.B., a minor, by and through, Myreka
Banks, Guardian and Next Friend; J.R., a minor,
by and through, Crystal Readus, Guardian and
Next Friend; T.M., a minor, by and through, Kitty
Blanks, Guardian and Next Friend; J.C., a minor,
by and through, Phillip Crouch, Guardian and
Next Friend; R.N., a minor, by and through,
Dianne Millsaps, Guardian and Next Friend; T.S.,
a minor, by and through, Timeka Banks, Guardian
and Next Friend; J.W., a minor, by and through,
Rashaan Wallace, Guardian and Next Friend;
A.T., a minor, by and through, Ashley D Bracey,
Guardian and Next Friend; P.W., a minor, by and
through, Princess Vaughn, Guardian and Next
Friend; D.H., a minor, by and through, Lisa King,
Guardian and Next Friend; A.R., a minor, by and
through, Anachierrah Ousley, Guardian and Next
Friend; J.E., a minor, by and through, Antranett
Edwards, Guardian and Next Friend; K.C., a
minor, by and through, Brittany Ashley, Guardian
and Next Friend; A.S., a minor, by and through,
Carla K Stevens, Guardian and Next Friend; K.R.,
a minor, by and through, Samalia Butler,

4

Guardian and Next Friend; D.G., a minor, by and through, Shawanna Graves, Guardian and Next Friend; A.M., a minor, by and through, LaTonya Mack, Guardian and Next Friend; B.J., a minor, by and through, Quantia Pendleton, Guardian and Next Friend; A.W., a minor, by and through, Patrick Wright, Guardian and Next Friend; J.A., a minor, by and through, Jenica Arnold, Guardian and Next Friend; K.C., a minor, by and through, Kavondra Mccauley, Guardian and Next Friend; G.L., a minor, by and through, Tara Lomax, Guardian and Next Friend; S.B., a minor, by and through, Suneva Burkhalter, Guardian and Next Friend; J.S., a minor, by and through, Brittany Horne, Guardian and Next Friend; H.H., a minor, by and through, Lashonda Henry, Guardian and Next Friend; T.E., a minor, by and through, Martez Burnley, Guardian and Next Friend; A.B., a minor, by and through, Sherika Washington, Guardian and Next Friend; J.W., a minor, by and through, Crystal Wallace, Guardian and Next Friend; K.L., a minor, by and through, Alexis Foster, Guardian and Next Friend; A.M., a minor, by and through, Robin Mccree, Guardian and Next Friend; E.G., a minor, by and through, Tameka M Everett Martin, Guardian and Next Friend; J.T., a minor, by and through, Lekeria Bell, Guardian and Next Friend; J.B., a minor, by and through, Lawanda Bernard, Guardian and Next Friend; J.C., a minor, by and through, Phillip Crouch, Guardian and Next Friend; S.J., a minor, by and through, London Reed, Guardian and Next Friend; L.G., a minor, by and through, Asha Burkett, Guardian and Next Friend; A.W., a minor, by and through, Beatrina L Wright, Guardian and Next Friend; A.O., a minor, by and through, Octaria Ollie, Guardian and Next Friend; A.O., a minor, by and through, Anachierrah Ousley, Guardian and Next Friend; P.R., a minor,

by and through, Remonica Mitchell, Guardian
and Next Friend; E.J., a minor, by and through,
Santana N Mcgee, Guardian and Next Friend;
C.L., a minor, by and through, Krystie Roberts,
Guardian and Next Friend; J.L., a minor, by and
through, Shamika Conley, Guardian and Next
Friend; A.C., a minor, by and through, Antonio
Carroll, Guardian and Next Friend; Q.B., a minor,
by and through, Bridget Chambers, Guardian and
Next Friend; T.E., a minor, by and through,
Tayler Boggans, Guardian and Next Friend;
K.W., a minor, by and through, Montrisa West,
Guardian and Next Friend; A.M., a minor, by and
through, Tameka M Everett Martin, Guardian and
Next Friend; K.T., a minor, by and through,
Megan Christian, Guardian and Next Friend; T.J.,
a minor, by and through, Tekeshi Jackson,
Guardian and Next Friend; A.T., a minor, by and
through, Sade Tyler, Guardian and Next Friend;
D.D., a minor, by and through, Constance
Washington, Guardian and Next Friend; J.W., a
minor, by and through, Alicia Williams, Guardian
and Next Friend; J.S., a minor, by and through,
Chiquita L Weathers, Guardian and Next Friend;
R.J., a minor, by and through, Lashanna Jordan,
Guardian and Next Friend; M.W., a minor, by and
through, Patrick Wright, Guardian and Next
Friend; O.A., a minor, by and through, Margret O
Hutton, Guardian and Next Friend; K.J., a minor,
by and through, Kimmatre Owens, Guardian and
Next Friend; T.B., a minor, by and through,
Tywanna Harris-Baggett, Guardian and Next
Friend; J.S., a minor, by and through, Dietrick
Blackwell, Guardian and Next Friend; M.W., a
minor, by and through, Melissa Odom, Guardian
and Next Friend; M.T., a minor, by and through,
Andre Taylor, Guardian and Next Friend; J.S., a
minor, by and through, Jalissa J Cattenhead,
Guardian and Next Friend; K.S., a minor, by and

through, Lloydrina Smith-fortner, Guardian and Next Friend; R.T., a minor, by and through, Kimberly Taylor, Guardian and Next Friend; R.T., a minor, by and through, Kimberly Taylor, Guardian and Next Friend; J.R., a minor, by and through, Gwendolyn Reed-Davis, Guardian and Next Friend; J.R., a minor, by and through, Gwendolyn Reed-Davis, Guardian and Next Friend; A.E., a minor, by and through, Antranett Edwards, Guardian and Next Friend; S.D., a minor, by and through, Tonya Davis, Guardian and Next Friend; A.B., a minor, by and through, Myreka Banks, Guardian and Next Friend; E.W., a minor, by and through, Tesha Wells, Guardian and Next Friend; J.J., a minor, by and through, Yvonne Smith, Guardian and Next Friend; E.W., a minor, by and through, Patricia Hinton, Guardian and Next Friend; K.M., a minor, by and through, Brenda Horne, Guardian and Next Friend; T.A., a minor, by and through, Yvonne D. Arnold, Guardian and Next Friend; A.J., a minor, by and through, London Reed, Guardian and Next Friend; M.H., a minor, by and through, Christal Singh, Guardian and Next Friend; M.H., a minor, by and through, Chimire Pate, Guardian and Next Friend; A.M., a minor, by and through, Shunketta Mccool, Guardian and Next Friend; L.W., a minor, by and through, Adreaun Teshonn Keyes, Guardian and Next Friend; A.G., a minor, by and through, Carla K Stevens, Guardian and Next Friend; C.B., a minor, by and through, Pamela Broome, Guardian and Next Friend; C.T., a minor, by and through, Ebony Belton, Guardian and Next Friend; L.T., a minor, by and through, Raven Bryant, Guardian and Next Friend; A.S., a minor, by and through, Hayley Smith, Guardian and Next Friend; A.C., a minor, by and through, Chaos Causey, Guardian and Next Friend; M.H., a minor, by and through, Nicole Liddell, Guardian

and Next Friend; M.H., a minor, by and through, Nicole Liddell, Guardian and Next Friend; T.J., a minor, by and through, Markiesha Earley, Guardian and Next Friend; E.G., a minor, by and through, Marquesha Chambers, Guardian and Next Friend; A.B., a minor, by and through, Brittany Jones, Guardian and Next Friend; Z.R., a minor, by and through, Shanna Byrd, Guardian and Next Friend; V.M., a minor, by and through, Travon L Mccall, Guardian and Next Friend; C.S., a minor, by and through, Raquesia Smith, Guardian and Next Friend; J.W., a minor, by and through, Rashaan Wallace, Guardian and Next Friend; A.W., a minor, by and through, Jackie Williams, Guardian and Next Friend; R.S., a minor, by and through, Octivita Smith, Guardian and Next Friend; K.D., a minor, by and through, Kevin Doss, Guardian and Next Friend; T.E., a minor, by and through, Talor Rancifer, Guardian and Next Friend; D.P., a minor, by and through, DeShean Parker, Guardian and Next Friend; K.K., a minor, by and through, Candace Gilliam, Guardian and Next Friend; K.J., a minor, by and through, Chauntessa Scott, Guardian and Next Friend; L.H., a minor, by and through, Chaprice Holmes, Guardian and Next Friend; A.W., a minor, by and through, Sherika Washington, Guardian and Next Friend; T.O., a minor, by and through, Marquetta Williams, Guardian and Next Friend; F.T., a minor, by and through, Ashley D Bracey, Guardian and Next Friend; K.H., a minor, by and through, Octavia Ward, Guardian and Next Friend; J.P., a minor, by and through, Ruby Pugh, Guardian and Next Friend; L.Y., a minor, by and through, Danielle Thomas, Guardian and Next Friend; L.Y., a minor, by and through, Danielle Thomas, Guardian and Next Friend; M.G., a minor, by and through, Marcus Green, Guardian and Next Friend; K.A., a minor, by and

through, Josephine Montgomery, Guardian and Next Friend; J.O., a minor, by and through, Geneiece O'Quinn, Guardian and Next Friend; E.W., a minor, by and through, Beatrina L Wright, Guardian and Next Friend; G.W., a minor, by and through, Chiquita L Weathers, Guardian and Next Friend; J.P., a minor, by and through, Monique Pendleton, Guardian and Next Friend; A.M., a minor, by and through, Bridget Chambers, Guardian and Next Friend; A.M., a minor, by and through, Bridget Chambers, Guardian and Next Friend; C.T., a minor, by and through, Ronald B Tate, Guardian and Next Friend; K.N., a minor, by and through, Joseph M Bennett, Guardian and Next Friend; T.E., a minor, by and through, Lakysha Jordan, Guardian and Next Friend; R.F., a minor, by and through, Rebecca Paige, Guardian and Next Friend; R.F., a minor, by and through, Rebecca Paige, Guardian and Next Friend; S.M., a minor, by and through, Mattie Mckennis, Guardian and Next Friend; M.M., a minor, by and through, Maria A Granger, Guardian and Next Friend; A.A., a minor, by and through, Latunya Allen, Guardian and Next Friend; K.W., a minor, by and through, Kyri Thomas, Guardian and Next Friend; R.B., a minor, by and through, Timeka Banks, Guardian and Next Friend; Z.K., a minor, by and through, Pamela Reginal, Guardian and Next Friend; Z.K., a minor, by and through, Pamela Reginal, Guardian and Next Friend; R.S., a minor, by and through, Octivita Smith, Guardian and Next Friend; J.R., a minor, by and through, Crystal Readus, Guardian and Next Friend; A.L., a minor, by and through, Gladys Lewis, Guardian and Next Friend; J.P., a minor, by and through, Latasha Denise Pate, Guardian and Next Friend; B.C., a minor, by and through, Candace Hunley, Guardian and Next Friend; J.W., a minor, by and

through, Venesha Shavers, Guardian and Next
Friend; K.J., a minor, by and through, Quintina N
Brown, Guardian and Next Friend; P.G., a minor,
by and through, Marquesha Chambers, Guardian
and Next Friend; C.H., a minor, by and through,
Candice Hill, Guardian and Next Friend; J.W., a
minor, by and through, Samalia Butler, Guardian
and Next Friend; R.L., a minor, by and through,
Catina Lake, Guardian and Next Friend; Z.H., a
minor, by and through, Chimire Pate, Guardian
and Next Friend; L.S., a minor, by and through,
Dietrick Blackwell, Guardian and Next Friend;
T.N., a minor, by and through, DeShean Parker,
Guardian and Next Friend; T.N., a minor, by and
through, DeShean Parker, Guardian and Next
Friend; A.B., a minor, by and through, Montrisa
West, Guardian and Next Friend; J.N., a minor,
by and through, Jennifer Bozeman, Guardian and
Next Friend; D.H., a minor, by and through,
Margret O Hutton, Guardian and Next Friend;
C.Y., a minor, by and through, Ashley Stogner,
Guardian and Next Friend; A.G., a minor, by and
through, Erica S Banks, Guardian and Next
Friend; C.S., a minor, by and through, Raquesia
Smith, Guardian and Next Friend; A.B., a minor,
by and through, Shonda Archie, Guardian and
Next Friend; B.W., a minor, by and through,
Adreaun Teshonn Keyes, Guardian and Next
Friend; I.W., a minor, by and through, Patricia
Hinton, Guardian and Next Friend; A.G., a minor,
by and through, Christal Singh, Guardian and
Next Friend; B.R., a minor, by and through,
Jarques Ratliff, Guardian and Next Friend; L.R.,
a minor, by and through, Gwendolyn Reed-Davis,
Guardian and Next Friend; D.S., a minor, by and
through, Chiquita L Weathers, Guardian and Next
Friend; A.S., a minor, by and through, Andrea
Taylor, Guardian and Next Friend; J.H., a minor,
by and through, Oscar Hundley, Guardian and

Next Friend; J.J., a minor, by and through, Eric
Simon, Guardian and Next Friend; P.E., a minor,
by and through, Anita F Griffin, Guardian and
Next Friend; J.C., a minor, by and through,
Rashaan Wallace, Guardian and Next Friend;
E.J., a minor, by and through, Santana N Mcgee,
Guardian and Next Friend; R.W., a minor, by and
through, Shunketta Mccool, Guardian and Next
Friend; A.B., a minor, by and through, Angela
McVeigh, Guardian and Next Friend; T.E., a
minor, by and through, Talor Rancifer, Guardian
and Next Friend; Z.J., a minor, by and through,
Joycelyn Young, Guardian and Next Friend; J.D.,
a minor, by and through, Gillanda Travis,
Guardian and Next Friend; F.T., a minor, by and
through, Samantha Thompson, Guardian and
Next Friend; J.E., a minor, by and through,
Monique Pendleton, Guardian and Next Friend;
K.M., a minor, by and through, Jackie Williams,
Guardian and Next Friend; S.W., a minor, by and
through, Fitima Ward, Guardian and Next Friend;
K.L., a minor, by and through, Alexis Foster,
Guardian and Next Friend; K.S., a minor, by and
through, Kyra Smith, Guardian and Next Friend;
B.H., a minor, by and through, Tressica Davis,
Guardian and Next Friend; C.A., a minor, by and
through, Dominique Heath, Guardian and Next
Friend; D.M., a minor, by and through, Ciara T
Mcdonald, Guardian and Next Friend; A.B., a
minor, by and through, Brittany Jones, Guardian
and Next Friend; A.O., a minor, by and through,
Octaria Ollie, Guardian and Next Friend; L.T., a
minor, by and through, Ladarren Taylor,
Guardian and Next Friend; A.H., a minor, by and
through, Sherry Hoskins, Guardian and Next
Friend; M.B., a minor, by and through, Myreka
Banks, Guardian and Next Friend; J.T., a minor,
by and through, Cowanda Pendleton, Guardian
and Next Friend; M.T., a minor, by and through,

11

Cowanda Pendleton, Guardian and Next Friend;
M.S., a minor, by and through, Fiona Jones,
Guardian and Next Friend; J.J., a minor, by and
through, Tanya M Johnson, Guardian and Next
Friend; M.F., a minor, by and through, Lloydrina
Smith-fortner, Guardian and Next Friend; C.R., a
minor, by and through, Monique Edwards,
Guardian and Next Friend; L.J., a minor, by and
through, Samalia Butler, Guardian and Next
Friend; M.C., a minor, by and through, Chaos
Causey, Guardian and Next Friend; Z.H., a minor,
by and through, Bridget Linion, Guardian and
Next Friend; K.R., a minor, by and through,
Olexcess D Reed, Guardian and Next Friend;
J.M., a minor, by and through, Kavondra
Mccauley, Guardian and Next Friend; C.G., a
minor, by and through, Charlena E Robinson,
Guardian and Next Friend; J.B., a minor, by and
through, Amber Bracey, Guardian and Next
Friend; M.S., a minor, by and through, Reneika
Shares, Guardian and Next Friend; J.L., a minor,
by and through, Crystal D Chancellor, Guardian
and Next Friend; K.J., a minor, by and through,
Chauntessa Scott, Guardian and Next Friend;
A.L., a minor, by and through, Stephanie M
Mitchell, Guardian and Next Friend; O.W., a
minor, by and through, Eula Meeks Weathers,
Guardian and Next Friend; Z.M., a minor, by and
through, Robin Mccree, Guardian and Next
Friend; J.C., a minor, by and through, Audrey
Elmore, Guardian and Next Friend; T.W., a
minor, by and through, Patricia Hinton, Guardian
and Next Friend; M.H., a minor, by and through,
Chanda Hicks, Guardian and Next Friend; R.H., a
minor, by and through, Lakimbie Henry,
Guardian and Next Friend; A.M., a minor, by and
through, Fatemeh Lewis, Guardian and Next
Friend; M.M., a minor, by and through, Genesis
Berry, Guardian and Next Friend; A.T., a minor,

12

by and through, Andre Taylor, Guardian and Next
Friend; O.M., a minor, by and through, Amanda
Williams, Guardian and Next Friend; J.B., a
minor, by and through, Jessica D Vercher,
Guardian and Next Friend; A.N., a minor, by and
through, Angel Bobbitt, Guardian and Next
Friend; E.M., a minor, by and through, Tameka M
Everett Martin, Guardian and Next Friend; G.L.,
a minor, by and through, Portia Lomax, Guardian
and Next Friend; K.A., a minor, by and through,
Latunya Allen, Guardian and Next Friend; T.T., a
minor, by and through, Samantha Thompson,
Guardian and Next Friend; M.D., a minor, by and
through, Ruby Washington, Guardian and Next
Friend; N.F., a minor, by and through, Sheryl
Fairley, Guardian and Next Friend; J.R., a minor,
by and through, Gwendolyn Reed-Davis,
Guardian and Next Friend; D.D., a minor, by and
through, Milton Dampier, Guardian and Next
Friend; S.R., a minor, by and through, Trenton
Reed, Guardian and Next Friend; L.B., a minor,
by and through, Raven Bryant, Guardian and
Next Friend; R.L., a minor, by and through,
Catina Lake, Guardian and Next Friend; C.M., a
minor, by and through, Remonica Mitchell,
Guardian and Next Friend; J.B., a minor, by and
through, Kim Beverly, Guardian and Next Friend;
T.R., a minor, by and through, Talor Rancifer,
Guardian and Next Friend; A.H., a minor, by and
through, Shameka P Holden, Guardian and Next
Friend; J.R., a minor, by and through, Crystal
Readus, Guardian and Next Friend; C.S., a minor,
by and through, Rachel Wright, Guardian and
Next Friend; G.W., a minor, by and through,
Ebony Bethany, Guardian and Next Friend; J.H.,
a minor, by and through, Latiea Funches,
Guardian and Next Friend; R.S., a minor, by and
through, Octivita Smith, Guardian and Next
Friend; J.S., a minor, by and through, Elsie

Mccoy, Guardian and Next Friend; A.M., a minor, by and through, LaTonya Mack, Guardian and Next Friend; L.J., a minor, by and through, Tina Hines, Guardian and Next Friend; R.T., a minor, by and through, Kitty Blanks, Guardian and Next Friend; J.K., a minor, by and through, Jennifer Pate, Guardian and Next Friend; L.L., a minor, by and through, Angel Gaylor, Guardian and Next Friend; L.M., a minor, by and through, Asha Burkett, Guardian and Next Friend; J.G., a minor, by and through, Tiffany Goods, Guardian and Next Friend; B.B., a minor, by and through, Joseph M Bennett, Guardian and Next Friend; R.B., a minor, by and through, April Myles, Guardian and Next Friend; A.P., a minor, by and through, Yolanda Payton, Guardian and Next Friend; J.D., a minor, by and through, Gillanda Travis, Guardian and Next Friend; E.M., a minor, by and through, Dominique Marshall, Guardian and Next Friend; D.R., a minor, by and through, Dianne Millsaps, Guardian and Next Friend; L.M., a minor, by and through, Tywanna Harris-Baggett, Guardian and Next Friend; N.A., a minor, by and through, Quanika Thomas, Guardian and Next Friend; M.R., a minor, by and through, Shonika M Cooper, Guardian and Next Friend; A.L., a minor, by and through, Edna Lewis, Guardian and Next Friend; D.H., a minor, by and through, Brenda Horne, Guardian and Next Friend; L.W., a minor, by and through, Jasmine N Carter, Guardian and Next Friend; D.T., a minor, by and through, Jasmine N Carter, Guardian and Next Friend; K.D., a minor, by and through, Kimberley Davis, Guardian and Next Friend; E.R., a minor, by and through, Cara Rand, Guardian and Next Friend; G.L., a minor, by and through, Portia Lomax, Guardian and Next Friend; K.D., a minor, by and through, Tanisha Dean, Guardian and Next Friend; A.C., a minor,

by and through, Jalanna Butler, Guardian and Next Friend; J.M., a minor, by and through, Marie Moore, Guardian and Next Friend; J.M., a minor, by and through, Bridget Chambers, Guardian and Next Friend; R.J., a minor, by and through, Sherry D Jones, Guardian and Next Friend; J.C., a minor, by and through, Martez Burnley, Guardian and Next Friend; M.J., a minor, by and through, Naossha Jones, Guardian and Next Friend; A.R., a minor, by and through, Ayla Reed, Guardian and Next Friend; E.T., a minor, by and through, Pamela Broome, Guardian and Next Friend; R.P., a minor, by and through, Rebecca Paige, Guardian and Next Friend; L.G., a minor, by and through, Alicia Williams, Guardian and Next Friend; T.O., a minor, by and through, Gladys Overton, Guardian and Next Friend; Z.C., a minor, by and through, Quintina N Brown, Guardian and Next Friend; J.F., a minor, by and through, Clancy A Freeman, Guardian and Next Friend; J.F., a minor, by and through, Clancy A Freeman, Guardian and Next Friend; L.F., a minor, by and through, Gabrial Floyd Jones, Guardian and Next Friend; T.G., a minor, by and through, Michaela Gilmore, Guardian and Next Friend; J.L., a minor, by and through, Crystal D Chancellor, Guardian and Next Friend; R.S., a minor, by and through, Octivita Smith, Guardian and Next Friend; D.H., a minor, by and through, Drusilla Hicks, Guardian and Next Friend; K.P., a minor, by and through, Constance Washington, Guardian and Next Friend; A.D., a minor, by and through, Mallory Tindol, Guardian and Next Friend; K.B., a minor, by and through, Shelton Brock, Guardian and Next Friend; A.H., a minor, by and through, Victoria R Collins, Guardian and Next Friend; A.P., a minor, by and through, Tonya Hughes, Guardian and Next Friend; A.T., a minor, by and through, Porche Thomas,

Guardian and Next Friend; J.V., a minor, by and through, Nekkie Veal, Guardian and Next Friend; M.C., a minor, by and through, Marquesha Chambers, Guardian and Next Friend; M.P., a minor, by and through, Jennifer Pate, Guardian and Next Friend; T.C., a minor, by and through, Shawanna Graves, Guardian and Next Friend; J.B., a minor, by and through, Stephanie T Weatherby, Guardian and Next Friend; B.H., a minor, by and through, Dominique Heath, Guardian and Next Friend; A.T., a minor, by and through, Samantha Thompson, Guardian and Next Friend; R.K., a minor, by and through, Melissa Taylor, Guardian and Next Friend; L.W., a minor, by and through, Tyresha Luckett, Guardian and Next Friend; C.H., a minor, by and through, Sheena Hughes, Guardian and Next Friend; J.J., a minor, by and through, Linda Bunzy, Guardian and Next Friend; J.B., a minor, by and through, Joseph M Bennett, Guardian and Next Friend; M.J., a minor, by and through, Laura Bell, Guardian and Next Friend; C.H., a minor, by and through, Crystal Wallace, Guardian and Next Friend; J.J., a minor, by and through, Valeria N Haley, Guardian and Next Friend; A.B., a minor, by and through, Suneva Burkhalter, Guardian and Next Friend; G.W., a minor, by and through, Larissa Fuller, Guardian and Next Friend; J.L., a minor, by and through, Africa Murphy, Guardian and Next Friend; J.J., a minor, by and through, Keona Grubbs, Guardian and Next Friend; B.P., a minor, by and through, Violet Powell, Guardian and Next Friend; W.H., a minor, by and through, Chimire Pate, Guardian and Next Friend; K.R., a minor, by and through, Olexcess D Reed, Guardian and Next Friend; M.W., a minor, by and through, Peggy M Washington, Guardian and Next Friend; M.K., a minor, by and through, Lesley Kelly, Guardian and Next Friend; A.L., a

16

minor, by and through, Fatemeh Lewis, Guardian
and Next Friend; D.L., a minor, by and through,
Reneika Shares, Guardian and Next Friend; J.B.,
a minor, by and through, Ebony Bethany,
Guardian and Next Friend; D.M., a minor, by and
through, Christy Kidd, Guardian and Next Friend;
T.N., a minor, by and through, Kareena S
Calhoun, Guardian and Next Friend; C.Y., a
minor, by and through, Ashley Stogner, Guardian
and Next Friend; L.S., a minor, by and through,
Amanda Bell, Guardian and Next Friend; R.H., a
minor, by and through, Lakimbie Henry,
Guardian and Next Friend; A.H., a minor, by and
through, Shameka P Holden, Guardian and Next
Friend; D.C., a minor, by and through, Ashley l
Cousin, Guardian and Next Friend; T.W., a
minor, by and through, Rashaan Wallace,
Guardian and Next Friend; M.G., a minor, by and
through, Marcus Green, Guardian and Next
Friend; K.D., a minor, by and through,
Keshawnee T Russell, Guardian and Next Friend;
J.S., a minor, by and through, Courtney Torrey,
Guardian and Next Friend; S.G., a minor, by and
through, Candace Gilliam, Guardian and Next
Friend; R.J., a minor, by and through, Mallery
Williams, Guardian and Next Friend; K.M., a
minor, by and through, Pamela K Hall, Guardian
and Next Friend; D.L., a minor, by and through,
Victoria L Richmond, Guardian and Next Friend;
C.H., a minor, by and through, Pearline Herbert,
Guardian and Next Friend; D.M., a minor, by and
through, Kevin Matthews, Guardian and Next
Friend; T.R., a minor, by and through, Trenton
Reed, Guardian and Next Friend; S.W., a minor,
by and through, Eula Meeks Weathers, Guardian
and Next Friend; E.L., a minor, by and through,
Cara Rand, Guardian and Next Friend; N.J., a
minor, by and through, Tonya Harden, Guardian
and Next Friend; J.T., a minor, by and through,

LaTonya Myles, Guardian and Next Friend;
M.C., a minor, by and through, Patrecia
Campbell, Guardian and Next Friend; K.H., a
minor, by and through, T'Keyah Harris, Guardian
and Next Friend; J.S., a minor, by and through,
Nakeisha Harris, Guardian and Next Friend; K.J.,
a minor, by and through, Chauntessa Scott,
Guardian and Next Friend; M.R., a minor, by and
through, Shonika M Cooper, Guardian and Next
Friend; Z.J., a minor, by and through, SherLonda
Johnson, Guardian and Next Friend; M.H., a
minor, by and through, Chaprice Holmes,
Guardian and Next Friend; J.F., a minor, by and
through, Clancy A Freeman, Guardian and Next
Friend; G.D., a minor, by and through, Euneka
Davis, Guardian and Next Friend; A.C., a minor,
by and through, Leda Cavitt, Guardian and Next
Friend; A.C., a minor, by and through, Leda
Cavitt, Guardian and Next Friend; B.W., a minor,
by and through, Fitima Ward, Guardian and Next
Friend; J.S., a minor, by and through, Jalissa J
Cattenhead, Guardian and Next Friend; M.P., a
minor, by and through, Trista Paige, Guardian and
Next Friend; K.N., a minor, by and through,
Angel Bobbitt, Guardian and Next Friend; L.D., a
minor, by and through, Mary B Davis, Guardian
and Next Friend; M.F., a minor, by and through,
Ruby Pugh, Guardian and Next Friend; A.T., a
minor, by and through, Angela Trehan, Guardian
and Next Friend; C.W., a minor, by and through,
Megan Malone, Guardian and Next Friend; E.W.,
a minor, by and through, Debra Gates, Guardian
and Next Friend; P.W., a minor, by and through,
Danielle Thomas, Guardian and Next Friend; J.P.,
a minor, by and through, Latasha Denise Pate,
Guardian and Next Friend; J.O., a minor, by and
through, Geneiece O'Quinn, Guardian and Next
Friend; S.T., a minor, by and through, Samantha
Thompson, Guardian and Next Friend; A.O., a

minor, by and through, Gladys Overton, Guardian
and Next Friend; Z.H., a minor, by and through,
Yashundra Halloway, Guardian and Next Friend;
P.B., a minor, by and through, Pamela Broome,
Guardian and Next Friend; R.J., a minor, by and
through, Akemi Stout, Guardian and Next Friend;
J.D., a minor, by and through, Tracey Denson,
Guardian and Next Friend; J.F., a minor, by and
through, Maranda L Brent, Guardian and Next
Friend; C.C., a minor, by and through, Quintina N
Brown, Guardian and Next Friend; T.W., a minor,
by and through, Terrance Watts, Guardian and
Next Friend; D.A., a minor, by and through,
Dallas Anding, Guardian and Next Friend; M.M.,
a minor, by and through, Latoya Mccurtis,
Guardian and Next Friend; B.L., a minor, by and
through, Tiffany Luckett, Guardian and Next
Friend; T.H., a minor, by and through, Shamika
Conley, Guardian and Next Friend; G.A., a minor,
by and through, Arletta Luckett-Austin, Guardian
and Next Friend; J.W., a minor, by and through,
Erick Weathersby, Guardian and Next Friend;
K.D., a minor, by and through, Keshawnee T
Russell, Guardian and Next Friend; A.P., a minor,
by and through, Yolanda Payton, Guardian and
Next Friend; J.H., a minor, by and through,
Tameka McLaurin, Guardian and Next Friend;
Y.K., a minor, by and through, Kathlene
Anderson, Guardian and Next Friend; L.T., a
minor, by and through, Porche Thomas, Guardian
and Next Friend; T.H., a minor, by and through,
Freda M Murriel, Guardian and Next Friend; J.T.,
a minor, by and through, Alicia Williams,
Guardian and Next Friend; T.J., a minor, by and
through, Fiona Jones, Guardian and Next Friend;
J.N., a minor, by and through, Veronica Ratliff,
Guardian and Next Friend; T.A., a minor, by and
through, Arletta Luckett-Austin, Guardian and
Next Friend; E.C., a minor, by and through,

19

Mallory Tindol, Guardian and Next Friend; K.M., a minor, by and through, Lakesha Mcdonald, Guardian and Next Friend; J.W., a minor, by and through, Renee Gallion, Guardian and Next Friend; J.G., a minor, by and through, Tiffany Goods, Guardian and Next Friend; T.W., a minor, by and through, Timeka Banks, Guardian and Next Friend; A.N., a minor, by and through, Angel Bobbitt, Guardian and Next Friend; D.D., a minor, by and through, Daniel Davis, Guardian and Next Friend; J.T., a minor, by and through, Catherine Harris Taylor, Guardian and Next Friend; L.H., a minor, by and through, J. H. Hurt, III, Guardian and Next Friend; L.L., a minor, by and through, Kavondra Mccauley, Guardian and Next Friend; J.W., a minor, by and through, Monchele Williams, Guardian and Next Friend; K.W., a minor, by and through, Tesha Wells, Guardian and Next Friend; D.C., a minor, by and through, Patricia James-Baldwin, Guardian and Next Friend; K.W., a minor, by and through, Megan Malone, Guardian and Next Friend; T.S., a minor, by and through, Leslie Stewart, Guardian and Next Friend; J.B., a minor, by and through, Jessica Miller, Guardian and Next Friend; J.S., a minor, by and through, James Shoulders, Guardian and Next Friend; J.D., a minor, by and through, Maggie Dow, Guardian and Next Friend; C.H., a minor, by and through, Berkima L Harris, Guardian and Next Friend; L.W., a minor, by and through, Patricia Hinton, Guardian and Next Friend; J.J., a minor, by and through, Milton Dampier, Guardian and Next Friend; K.H., a minor, by and through, Oscar Hundley, Guardian and Next Friend; C.F., a minor, by and through, Cassandra Chapple, Guardian and Next Friend; K.S., a minor, by and through, Octavia Ward, Guardian and Next Friend; L.A., a minor, by and through, Michaela Gilmore, Guardian and Next

Friend; J.R., a minor, by and through, Andrea Taylor, Guardian and Next Friend; A.K., a minor, by and through, Shaunta Gowdy, Guardian and Next Friend; C.W., a minor, by and through, Ronald B Tate, Guardian and Next Friend; J.M., a minor, by and through, Christy Kidd, Guardian and Next Friend; C.G., a minor, by and through, Danielle Thomas, Guardian and Next Friend; E.W., a minor, by and through, David White, Guardian and Next Friend; M.H., a minor, by and through, Tina Hines, Guardian and Next Friend; J.D., a minor, by and through, Tracey Denson, Guardian and Next Friend; D.G., a minor, by and through, Natalie G Moore, Guardian and Next Friend; L.D., a minor, by and through, Gabrial Floyd Jones, Guardian and Next Friend; S.C., a minor, by and through, Debra D Collins, Guardian and Next Friend; D.S., a minor, by and through, Marquita Stewart, Guardian and Next Friend; T.J., a minor, by and through, Tekeshi Jackson, Guardian and Next Friend; M.T., a minor, by and through, Samantha Thompson, Guardian and Next Friend; K.Y., a minor, by and through, Alexis Foster, Guardian and Next Friend; A.W., a minor, by and through, Erick Weathersby, Guardian and Next Friend; K.J., a minor, by and through, Sherry D Jones, Guardian and Next Friend; M.J., a minor, by and through, Sherry D Jones, Guardian and Next Friend; K.C., a minor, by and through, Ebony Bethany, Guardian and Next Friend; T.D., a minor, by and through, Susan Tatum, Guardian and Next Friend; K.S., a minor, by and through, Kimberly Daniels, Guardian and Next Friend; J.D., a minor, by and through, Gillanda Travis, Guardian and Next Friend; A.H., a minor, by and through, Chaprice Holmes, Guardian and Next Friend; C.G., a minor, by and through, Anita F Griffin, Guardian and Next Friend; C.M., a minor, by and through,

Angela McVeigh, Guardian and Next Friend; J.O., a minor, by and through, Geneiece O'Quinn, Guardian and Next Friend; N.A., a minor, by and through, Quanika Thomas, Guardian and Next Friend; C.H., a minor, by and through, April Huntley, Guardian and Next Friend; R.B., a minor, by and through, Dietrick Blackwell, Guardian and Next Friend; A.B., a minor, by and through, Jessica D Vercher, Guardian and Next Friend; L.G., a minor, by and through, Alicia Williams, Guardian and Next Friend; J.J., a minor, by and through, Tanya M Johnson, Guardian and Next Friend; A.M., a minor, by and through, Brittney Shelby, Guardian and Next Friend; E.L., a minor, by and through, Cara Rand, Guardian and Next Friend; K.M., a minor, by and through, Lakesha Mcdonald, Guardian and Next Friend; O.O., a minor, by and through, Christopher K Carter, Guardian and Next Friend; J.D., a minor, by and through, Tracey Denson, Guardian and Next Friend; S.D., a minor, by and through, Maggie Dow, Guardian and Next Friend; A.D., a minor, by and through, Daniel Davis, Guardian and Next Friend; D.K., a minor, by and through, Tynecia Kelly, Guardian and Next Friend; N.M., a minor, by and through, Casey McCain, Guardian and Next Friend; P.N., a minor, by and through, Angel Bobbitt, Guardian and Next Friend; J.S., a minor, by and through, Renee Gallion, Guardian and Next Friend; R.M., a minor, by and through, LaTonya Mack, Guardian and Next Friend; A.L., a minor, by and through, Fatemeh Lewis, Guardian and Next Friend; A.R., a minor, by and through, Anachierrah Ousley, Guardian and Next Friend; A.W., a minor, by and through, Denise Davis, Guardian and Next Friend; O.H., a minor, by and through, Carleen Hicks, Guardian and Next Friend; T.S., a minor, by and through, Nikki L

Clark, Guardian and Next Friend; Z.S., a minor, by and through, Nikki L Clark, Guardian and Next Friend; A.S., a minor, by and through, Amanda Bell, Guardian and Next Friend; V.M., a minor, by and through, Freddric Brandon, Guardian and Next Friend; K.J., a minor, by and through, Chauntessa Scott, Guardian and Next Friend; K.J., a minor, by and through, Chauntessa Scott, Guardian and Next Friend; V.J., a minor, by and through, Valeria N Haley, Guardian and Next Friend; K.G., a minor, by and through, Krystie Roberts, Guardian and Next Friend; J.B., a minor, by and through, Stephanie T Weatherby, Guardian and Next Friend; A.B., a minor, by and through, Tamyia Garrett, Guardian and Next Friend; T.H., a minor, by and through, Freda M Murriel, Guardian and Next Friend; D.O., a minor, by and through, Gladys Overton, Guardian and Next Friend; A.R., a minor, by and through, Debra D Collins, Guardian and Next Friend; C.J., a minor, by and through, Cynthia Wilder, Guardian and Next Friend; C.D., a minor, by and through, Teresa Veasley, Guardian and Next Friend; J.D., a minor, by and through, Teresa Veasley, Guardian and Next Friend; K.J., a minor, by and through, Patricia Hinton, Guardian and Next Friend; D.M., a minor, by and through, Sheryl Fairley, Guardian and Next Friend; N.R., a minor, by and through, Celeste Perkins, Guardian and Next Friend; C.R., a minor, by and through, Charlena E Robinson, Guardian and Next Friend; K.L., a minor, by and through, Ruby Washington, Guardian and Next Friend; E.W., a minor, by and through, Erick Weathersby, Guardian and Next Friend; L.D., a minor, by and through, Jennifer Berry, Guardian and Next Friend; A.C., a minor, by and through, Angela Caldwell, Guardian and Next Friend; J.J., a minor, by and through, Sherry D Jones, Guardian

23

and Next Friend; M.S., a minor, by and through,
Marquita Stewart, Guardian and Next Friend;
D.M., a minor, by and through, Akemi Stout,
Guardian and Next Friend; C.C., a minor, by and
through, Chalmers Campbell, Guardian and Next
Friend; J.S., a minor, by and through, Gladys
Lewis, Guardian and Next Friend; H.S., a minor,
by and through, Nikki L Clark, Guardian and
Next Friend; D.Y., a minor, by and through,
Samantha Thompson, Guardian and Next Friend;
J.R., a minor, by and through, Crystal Readus,
Guardian and Next Friend; T.A., a minor, by and
through, Denise Luckett, Guardian and Next
Friend; F.H., a minor, by and through, Fred
Andrew Herbert, Guardian and Next Friend; J.M.,
a minor, by and through, LaTonya Myles,
Guardian and Next Friend; A.B., a minor, by and
through, Shonda Archie, Guardian and Next
Friend; C.C., a minor, by and through, Angela
Caldwell, Guardian and Next Friend; J.D., a
minor, by and through, Tracey Denson, Guardian
and Next Friend; J.B., a minor, by and through,
Kim Beverly, Guardian and Next Friend; T.N., a
minor, by and through, Kareena S Calhoun,
Guardian and Next Friend; D.R., a minor, by and
through, Megan Malone, Guardian and Next
Friend; D.R., a minor, by and through, Megan
Malone, Guardian and Next Friend; J.R., a minor,
by and through, Crystal Readus, Guardian and
Next Friend; M.A., a minor, by and through,
Gladys Lewis, Guardian and Next Friend; R.B., a
minor, by and through, Dietrick Blackwell,
Guardian and Next Friend; J.H., a minor, by and
through, Latunya Allen, Guardian and Next
Friend; J.M., a minor, by and through, Linda
Kinnard, Guardian and Next Friend; M.O., a
minor, by and through, Christopher K Carter,
Guardian and Next Friend; M.O., a minor, by and
through, Christopher K Carter, Guardian and

Next Friend; A.S., a minor, by and through,
Tywanna Grice, Guardian and Next Friend;

      Plaintiffs,

          v.

The City of Jackson, Mississippi; Chokwe A.
Lumumba Jr.; Tony Yarber; Kishia Powell;
Robert Miller; Jerriot Smash; the Mississippi
State Department of Health; Jim Craig; Trilogy
Engineering Services LLC; and John Does 1–40,

      Defendants.

## **COMPLAINT AND JURY TRIAL DEMAND**

    Plaintiffs, all minors, by and through their respective Guardians and Next

Friends ("Plaintiffs"), hereby file this lawsuit against Defendants, the City of

Jackson.

    On October 19, 2021, Plaintiffs filed their original complaint, which was

amended on November 16, 2021, and thereafter amended for a second time on

February 17, 2022. Case No. 3:21-cv-00667, ECF Nos. 1, 8, 41. On July 20, 2022,

the Honorable Carlton W. Reeves consolidated that case with two other actions

brought by two additional groups of Plaintiffs—Case No. 3:22-cv-00171 and Case

No. 3:21-cv-00663. Case No. 3:21-cv-00663 became the lead docket for the

consolidated cases.

Subsequent to extensive motion practice, on March 23, 2023, Judge Reeves issued an order dismissing certain claims, but permitted Plaintiffs' 42 U.S.C. § 1983 bodily integrity claim to proceed against the City of Jackson, and Plaintiffs' Mississippi Tort Claims Act claims to proceed against the Mississippi State Department of Health.[1] Case No. 3:21-cv-00663, ECF No. 135. Judge Reeves also permitted Mississippi Tort Claims Act claims brought against the City of Jackson by Plaintiffs from Case No. 3:22-cv-00171 to proceed, but dismissed, **without prejudice**, those same claims by Plaintiffs from Case No. 3:21-cv-00663 and Case No. 3:21-cv-00667. Judge Reeves dismissed those Mississippi Tort Claims Act claims for failure to strictly abide by the ninety (90) day notice requirement with instructions for refiling, directing that: "When the cases are refiled, counsel shall note on the Civil Cover Sheet that the new filing is related to this instant case so that the new action will be processed accordingly." *Id.* at 57 n. 211.

Thus, Plaintiffs having now satisfied the ninety (90) day notice requirement of Miss. Code Ann. § 11-46-11(3),[2] and hereby file this complaint which, with the exception of these first four paragraphs, is identical to the amended complaint filed on February 17, 2022 in Case No. 3:21-cv-00667, ECF No. 41 (along with its

---

[1]    Plaintiff's claims against Trilogy Engineering Services LLC were not at issue in the motions.

[2]    Plaintiff originally filed the required notice on October 18, 2021.

accompanying exhibits).[3] Notwithstanding the inclusion of certain claims herein that were dismissed by Judge Reeves, Plaintiffs fully intend to abide by Judge Reeves' ruling—which dismissed Plaintiffs' claims against the individual defendants and Plaintiffs' § 1983 claims for state created danger against the City of Jackson—and have only included those claims (and defendants) here, out of an abundance of caution to preserve their appellate rights. Finally, Plaintiffs maintain that Judge Reeves' ruling should apply in its entirety to this complaint insofar as the defendants need not re-litigate the issues already determined by the Court in its March 23, 2023 order. *See, e.g., Lindquist v. City of Pasadena*, 669 F.3d 225, 238 (5th Cir. 2012) ("The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case.") (internal quotations omitted).

Plaintiffs are minors who at all material times resided in Jackson, Mississippi or else regularly consumed drinking water provided by Jackson. Plaintiffs were poisoned by lead released into Jackson's drinking water as a result of Defendants' conscience-shocking deliberate indifference. Plaintiffs assert claims for personal injuries based on Defendants' deprivation of Plaintiffs' right to bodily integrity protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Additionally, Plaintiffs assert personal injury claims based on

---

[3]        There are also minor spelling and grammatical corrections as well.

Government Defendants' negligence pursuant to Mississippi Code Ann. § 11-46-5. Finally, Plaintiffs assert personal injury claims against Trilogy Engineering Services LLC for professional and simple negligence in exacerbating the catastrophic and preventable public health crisis that has been continuing for well over half a decade.

## **INTRODUCTION**

1.      This is a civil action for damages for the lead poisoning of hundreds of children in Jackson, Mississippi.

2.      At virtually every turn, officials from the City of Jackson ("Jackson" or "the City") and the Mississippi State Department of Health ("MSDH") have made conscience-shocking decisions and have shown deliberate indifference that have led to Plaintiffs' exposure to toxic lead in Jackson's drinking water.

3.      Until approximately August 2014, Jackson maintained two separate water systems—one drawn from surface water from the Pearl River Basin ("the Pearl River") and Ross Barnett Reservoir ("the Reservoir"); the other drawn from well water drawn from the Maddux Road Well Water System.

4.      In late 2013 or early 2014, Jackson was warned that triennial testing required by the Safe Drinking Water Act ("SDWA") had shown levels of lead creeping up in the surface water system, although they were just below the U.S. Environmental Protection Agency's ("EPA") action level for lead in drinking water.

5.     Indeed, at that time, then-Interim Director of Public Works, Willie Bell ("Bell"), warned Jackson city officials, including then-Mayor Chokwe Lumumba Sr. ("Lumumba Sr.") of the likely the cause of increasing lead in the water: the surface water pH was dangerously acidic, and a lime-feed injection system that should have controlled the corrosive effect of the water was malfunctioning.

6.     Jackson officials were also aware of the well-known effect of low pH (acidic) water on lead pipes (like those in Jackson): The corrosive, acidic water strips a protective biofilm from the pipes and causes lead from the pipes to leach directly into the drinking water.

7.     In the spring of 2014, Jackson could have taken corrective measures to combat the rising lead levels in the City's water.

8.     It did not.

9.     Instead, in the Spring of 2014, then-Mayor of Jackson Tony Yarber ("Yarber") disregarded crucial advice from the City's Interim Director of Public Works who warned of corrosive water conditions and rising levels of lead in water due to the improper, malfunctioning, and non-functioning treatment of the dangerously low pH surface water from the Pearl River and the Reservoir.

10.     For most of the last decade, Jackson has improperly treated water from the Pearl River and the Reservoir as a water source for human use and consumption.

11. Surface water from the Pearl River and the Reservoir is highly corrosive and is not a viable permanent water source without the utilization of fine-tuned and elaborate corrosion controls.

12. Jackson and its water treatment plants lacked appropriate corrosion control methods required to provide viable water to its residents and water users for at least the last decade.

13. Additionally, until 2014, Jackson was utilizing well water to provide drinking water for a significant minority of its residents and water users—indeed, tens of thousands of water users. Those users had been receiving safe, high pH, and non-corrosive water.

14. The Yarber Administration quietly switched the water source for those thousands of water users to the unsafe, corrosive surface water from the Pearl River and the Reservoir.

15. Not only was Jackson not properly treating water from the Pearl River and the Reservoir as a water source for human use and consumption for the majority of its citizens and water users, the Jackson system (and particularly its ability to effectively treat the corrosive surface water from the Pearl River and the Reservoir) could not handle the sudden influx of thousands of new connections.

16. The Yarber Administration did not provide any warning or notification to customers before making the switch.

17.    In fact, the only notification customers received about the switch was in the Annual Drinking Water Quality Report long after switching.

18.    MSDH officials discovered the dangerously elevated lead exceeding the action threshold in the EPA's Lead and Copper Rule ("LCR"), from the Pearl River and the Reservoir in July 2015.

19.    Even the confirmed elevated lead levels greatly understated the threat, because the MSDH officials who performed the testing did so using a pre-flushing testing methodology, which generates artificially lower lead levels in test results.

20.    Tragically, MSDH and Jackson officials failed to warn Jackson's citizens, including Plaintiffs and Plaintiffs' families, of the issues with corrosive water from the Pearl River and the Reservoir until January 2016, nearly two years after former Interim Director Bell initially warned the City.

21.    Nor did the MSDH or Jackson officials warn Jackson's citizens and water users, including Plaintiffs and their families, of the threat of lead poisoning associated with Jackson's acidic water.

22.    The issues with Jackson's water have not been properly addressed, even to this day.

23.    In January 2016, when elevated lead levels from the City's well water were presented to Jackson, the City did not take any steps to ameliorate the hazard.

24.    On the contrary, Jackson officials and the Jackson City Council took a series of actions that greatly exacerbated the problem.

25.    Indeed, in April 2016, then-Mayor Yarber hired Trilogy Engineering Services LLC ("Trilogy") to conduct a water study, the contract for which was approved by the City Council.

26.    Trilogy was owned by Thessalonian Leblanc ("Leblanc"), who is not an engineer.

27.    In 2014, Leblanc held an off-the-books fundraiser for Yarber.

28.    Leblanc and Trilogy got a sweetheart deal – they were paid nearly as much to analyze the potential crisis as an actual fix to the problem would have cost in 2014.

29.    Trilogy failed to properly evaluate Jackson's water system.

30.    Indeed, despite being aware that utilization of a liquid lime treatment for corrosion control could provide a workable solution to the corrosion issue, Trilogy instead recommended using soda ash as a treatment, ignoring Mississippi's (and in particular Jackson's) humid environment.

31.    Trilogy's egregious and nonsensical recommendation was followed by the Jackson.

32.    Ultimately, because of the humidity levels in Jackson, the soda ash clumped into rocks and clogged the system, rendering the efforts to address corrosion control ineffective.

33.    At the same time, then-Public Works Director Kishia Powell ("Powell") repeatedly told the media and Jackson's citizenry that the water was safe to drink.

34.    Despite the painfully obvious similarity to the public health crisis in Flint, Michigan at that time, Powell repeatedly downplayed the threat in Jackson and told members of the media and the public that Jackson was no Flint.

35.    Along the way, Powell fired a whistleblower who brought to light details of the cause of Jackson's high lead levels.

36.    And, unsurprisingly, the crisis in Jackson worsened as Trilogy bungled its response and Jackson persistently refused to take basic actions to ensure its citizens and water users have access to safe, clean drinking water.

37.    Jackson remained out of compliance with the SDWA and the EPA's Lead and Copper Rule ("LCR") until at least 2017, more likely until March 2020, and most likely Jackson remains out of compliance today.

38.    Six years after it became apparent that Jackson's well water was not a sustainable water source without proper treatment, the EPA was forced to issue an Emergency Administrative Order in March 2020, after learning that Jackson still had

not taken even the most basic actions to ensure drinking water quality and that numerous components of the O.B. Curtis Water Treatment Plant, which provides Jackson's drinking water, were not functioning at all—let alone functioning in a manner that would ensure safe drinking water.

39.    Individually and in combination, these conscience-shocking acts of deliberate indifference have caused Jackson's citizens, including Plaintiffs and Plaintiffs' family, to struggle to find clean water, and have caused hundreds, if not thousands of Jackson's children, including each Plaintiff, to be poisoned.

40.    Plaintiffs' injuries are a direct and proximate result of Defendants' conduct.

41.    The effects of lead poisoning on a child are well known and heartbreakingly permanent: As a result of the Defendants' acts and omissions, Plaintiffs will never be the same. Plaintiffs have and will forever suffer cognitive deficits; Plaintiffs will have a reduced earning capacity compared to their peers; and Plaintiffs will feel shame throughout their lives as each struggle to keep up with classmates, family members, and ultimately coworkers.

42.    As more particularly set forth herein, Plaintiffs maintain, among other things, that Defendants caused Jackson's public health crisis to occur, as well as caused it to continue, worsen and persist for a longer period of time.

43.    Defendants also exacerbated the crisis by concealing and misrepresenting its scope, failing to take effective remedial action to eliminate it, and then lying about it to cover up their misconduct.

44.    Defendants' misconduct has produced a significant effect, long lasting and permanent, upon public rights, including Plaintiffs' health, safety, peace, comfort, and convenience.

45.    Plaintiffs have sustained violations of substantive due process rights, including the fundamental right to bodily integrity; and Plaintiffs have also sustained violations of substantive due process rights, including the fundamental right to not have the state create, inflict and/or exacerbate dangers through the culpable actions of public officials.

46.    At the same time, Defendants' actions are tortious under Mississippi common law; and Defendants' tortious actions have caused Plaintiffs to suffer injuries and damages.

47.    Plaintiffs therefore seek compensatory and punitive damages, and all other available remedies to redress the injuries caused by Defendants.

## JURISDICTION

48.    This is a civil action brought pursuant to 42 U.S.C. § 1983 against Defendants for violations of the Fourteenth Amendment of the United States Constitution.

49.    This Court has subject matter jurisdiction over Plaintiffs' § 1983 claims, pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the Constitution and laws of the United States.

50.    This Court may exercise supplemental jurisdiction over Plaintiffs' professional and simple negligence claims pursuant to 28 U.S.C. § 1367(a), because they are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of State law that predominate over claims for which this Court has original jurisdiction and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise under 42 U.S.C. § 1983.

51.    This Court has personal jurisdiction over Defendant the City of Jackson because it is a Mississippi municipality and because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi.

52.    This Court may exercise personal jurisdiction over Defendant Mayor Chokwe Lumumba Jr. ("Lumumba Jr.") because he is a citizen and resident of the State of Mississippi and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. Exercising personal jurisdiction over Mayor Lumumba Jr. comports with the Fourteenth Amendment's Due Process Clause

because Plaintiffs' claims arise out of and relate to Mayor Lumumba Jr.'s substantial contacts with Mississippi.

53.    This Court may exercise personal jurisdiction over Defendant former Mayor Tony Yarber because he is a citizen and resident of the State of Mississippi and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. Exercising personal jurisdiction over former Mayor Yarber comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to former Mayor Yarber's substantial contacts with Mississippi.

54.    This Court may exercise personal jurisdiction over Defendant Kishia Powell because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. She is subject to personal jurisdiction under Mississippi's long-arm statute because her conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over former Public Works Director Powell comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to former Public Works Director Powell's substantial contacts with Mississippi.

55.    This Court may exercise personal jurisdiction over Defendant Jerriot Smash because the acts and omissions giving rise to Plaintiff's claims took place in

the State of Mississippi. He is subject to personal jurisdiction under Mississippi's long-arm statute because his conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over former Public Works Director Smash comports with the Fourteenth Amendment's Due Process Clause because Plaintiff's claims arise out of and relate to former Public Works Director Smash's substantial contacts with Mississippi.

56.    This Court may exercise personal jurisdiction over Defendant Robert Miller because the acts and omissions giving rise to Plaintiff's claims took place in the State of Mississippi. He is subject to personal jurisdiction under Mississippi's long-arm statute because his conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over former Public Works Director Miller comports with the Fourteenth Amendment's Due Process Clause because Plaintiff's claims arise out of and relate to former Public Works Director Miller's substantial contacts with Mississippi.

57.    This Court has personal jurisdiction over Defendant the Mississippi State Department of Health because it is a Mississippi department of state government and because the acts and omissions giving rise to Plaintiff's claims took place in the State of Mississippi.

58.    This Court may exercise personal jurisdiction over Defendant Jim Craig because the acts and omissions giving rise to Plaintiff's claims took place in the State of Mississippi. He is subject to personal jurisdiction under Mississippi's long-arm statute because his conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over Senior Deputy of the MSDH and Director of Health Protection for MSDH comports with the Fourteenth Amendment's Due Process Clause because Plaintiff's claims arise out of and relate to Senior Deputy of the MSDH and Director of Health Protection for the MSDH Craig's substantial contacts with Mississippi.

59.    This Court may exercise personal jurisdiction over Defendant Trilogy Engineering Services, LLC because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. As alleged below, Trilogy maintains an office in Jackson, Mississippi which is, upon information and belief, its principal place business for the purposes of exercising general personal jurisdiction over it. Independently, Trilogy is subject to specific personal jurisdiction under Mississippi's long-arm statute because its conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over Trilogy comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs'

claims arise out of and relate to Trilogy's systematic and continuous contacts with Mississippi.

60.    This Court has personal jurisdiction over John Does 1 through 40 because they are, upon information and belief, citizens, and residents of the State of Mississippi, which subjects them to general personal jurisdiction, and because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. The John Doe Defendants are thus subject to specific personal jurisdiction under Mississippi's long-arm statute because their conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over them comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to their substantial contacts with Mississippi.

61.    Venue is proper under 28 U.S.C. § 1391 because nearly all of the Defendants reside in Jackson, Mississippi and because a substantial part of the events or omissions giving rise to the claim occurred in Jackson, Mississippi.

## **PARTIES**

62.    Plaintiffs have at all material times been residents and/or of Jackson, Mississippi and citizens of the State of Mississippi or else regularly consumed drinking water provided by Jackson.

63.    Plaintiffs have suffered personal injuries as a result of exposure to and consumption of Jackson's drinking water at a time when lead levels in the water were unsafe to drink or be exposed to.

64.    As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer injuries including but not necessarily limited to: lead poisoning, various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions).

65.    Defendant the City of Jackson is the capital of the State of Mississippi. It is a municipality created under the laws of Mississippi. Jackson maintains a Department of Public Works, which is responsible for, *inter alia*, managing the City's public water system so that Jackson's citizens and water users have access to clean, safe drinking water.

66.    Jackson is a Defendant because, despite the warnings and protests of City employees, including then-Interim Public Works Director Bell, Jackson—through its policies, customs, and practices—deliberately created, increased, and

prolonged the public health crisis at issue in this case and participated in the concealment of the harm it caused Plaintiffs.

67.    Defendant Lumumba Jr. is the current mayor of Jackson. The Mayor of Jackson is responsible for the management of city government, as well as for the health and welfare of its citizens and residents. Defendant Lumumba Jr. is sued in his individual capacity for the injuries he caused to Plaintiffs resulting from his deliberately indifferent deprivation of Plaintiffs' constitutional and civil rights. Mayor Lumumba Jr. is an official with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

68.    Defendant Yarber is the former mayor of Jackson, Mississippi. Former Mayor Yarber is sued in his individual capacity for damages because he deliberately made decisions about Jackson's water source that created the current public health crisis, and because he was deliberately indifferent to the suffering and injuries of Jackson's citizens and water users, including each Plaintiff, when he made further decisions that concealed, prolonged, and exacerbated the current public health crisis. Former Mayor Yarber was an official with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

69.    Defendant Powell is the former Public Works Director for Jackson. She was in this role from early 2014 to May 2016. Defendant Powell is sued in her

individual capacity for money damages because she was deliberately indifferent to the suffering and injury of Jackson's citizens and water users when she made decisions and statements that concealed and prolonged the current public health crisis. Former Director of Public Works Powell was an official with final policymaking authority (or delegated final policymaking authority) for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

70.     Defendant Jerriot Smash ("Smash") was the Interim Public Works Director for Jackson from approximately May 2016 to October 2017. Defendant Smash is sued in his individual capacity. Former Interim Public Works Director Smash was an official with final policymaking authority (or delegated final policymaking authority) for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

71.     Defendant Robert Miller ("Miller") was the Public Works Director for Jackson from at least October 2017 to July 2020. Defendant Miller is sued in his individual capacity. Former Public Works Director Miller was an official with final policymaking authority (or delegated final policymaking authority) for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

72.     Defendants John Doe 1 through 20 are other employees who, upon information and belief, took conscience-shocking actions and acted with deliberate indifference for Plaintiffs' safety in the face of a known risk of lead poisoning. They

are sued in their individual capacities for, *inter alia*, conducting water testing using a methodology that relies heavily on running the tap slower than a normal water user would and also pre-flushing lead from the faucet, both of which produce artificially low lead testing results and both of which are in contravention of the U.S. Environmental Protection Agency's clear, pre-existing guidance as to proper testing methodology. These artificially low lead levels were a deliberate result of an effort by Defendants John Doe 1 through 20 to conceal and understate the scope and gravity of the threat of lead poisoning in Jackson's water, and to cast the State of Mississippi and Jackson in a positive light by having few action level exceedances in which Mississippi municipalities like Jackson are out of compliance with federal law.

73.    The actions of lower-level City employees, not named as defendants herein, in delivering residents unsafe water were constrained by policies not of their own making. Jackson's water treatment employees were inadequately trained. In light of the duties assigned to them, the need for more training was obvious, and the inadequacy was so likely to result in the violation of constitutional rights that Jackson's policy makers can reasonably said to have been deliberately indifferent to the need for additional training.

74.     Jackson is liable because, through its policy makers, it violated the constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.

75.     Defendant Mississippi State Department of Health ("MSDH") is a Department of the State of Mississippi responsible for the health of Mississippi citizens, including each Plaintiff, in particular being responsible for Mississippians' health during environmental disasters and crises. Additionally, the MSDH is the State Department that has been delegated responsibility and primacy for protection of Mississippi's drinking water under the Safe Drinking Water Act ("SDWA").

76.     Defendant Jim Craig ("Craig") is the Senior Deputy of the MSDH and Director of Health Protection for the MSDH. He has served in the latter role since 2004. He is also the Emergency Planning Coordinator for the MSDH. He is sued in his individual capacity for his decision not to inform Jackson's citizens and water users until late January 2016 of the seriously elevated levels MSDH officials detected in June 2015, and also for his decision to direct lower level MSDH employees to conduct pre-stagnation flushing during testing for lead levels in Jackson residences.

77.     Defendants John Doe 21 through 40 are employees of the MSDH who conducted drinking water testing in Jackson, Mississippi from 2012 to the present. They are sued in their individual capacities for, *inter alia*, conducting water testing using a methodology that relies heavily on running the tap slower than a normal

water user would and also pre-flushing lead from the faucet, both of which produce artificially low lead testing results and both of which are in contravention of the U.S. Environmental Protection Agency's clear, pre-existing guidance as to proper testing methodology. These artificially low lead levels were a deliberate result of an effort by the Defendants John Doe 21 through 40 to conceal and understate the scope and gravity of the threat of lead poisoning in Jackson's water, and to cast the State of Mississippi and City of Jackson in a positive light by having few action level exceedances in which Mississippi municipalities like Jackson are out of compliance with federal law.

78.     Defendant Trilogy is a Texas limited liability company. Trilogy was previously organized under the laws of the State of Mississippi but dissolved effective May 20, 2015. Thereafter, it reorganized in Texas and registered as a Foreign LLC in Mississippi.

79.     Trilogy maintains a current business address at 210 East Capitol St. # 1050, Jackson, Mississippi 39201. Trilogy's website indicates that it intends "to provide engineering and professional services to municipal, private, and industrial clients in Mississippi."[4]

---

[4]     *About*,    Trilogy    Engineering    Services    LLC, https://trilogyengineers.com/about/ (last accessed May 17, 2021).

80.    Trilogy holds itself out as having "experience in design, managing, and overseeing construction of drinking water and wastewater (reuse water) projects."[5] Indeed, Trilogy lists "drinking water design" as the top service it provides, and specifies that Trilogy's services in this area include "[w]ater treatment plant operations," "[d]istribution waterline," and "Lead and Copper Corrosion Control study."[6]

## STATEMENT OF FACTS

I.    **The City of Jackson's Aging Public Water System, Which Uses Lead Pipes and Joints.**

81.    Jackson owns and/or operates a public water system (PWS ID No. MS0250008) which serves the vast majority of water users in the City.[7]

82.    Until approximately October 2014, Jackson also maintained a second public water system (PWS ID No. MS0250012) which circulated well water to a portion of the City's residents and additional water connections in the City of Byram and other outlying communities prior to August 2014.

---

[5]    *Id.*

[6]    *Services*,    Trilogy    Engineering    Services    LLC, https://trilogyengineers.com/services/ (last accessed May 17, 2021).

[7]    United States Environmental Protection Agency Region 4, Emergency Administrative Order, Docket No. SDWA-04-2020-2300 (Mar. 27, 2020), attached as Exhibit 1 and incorporated as if fully stated herein. All original exhibits attached in ECF 1 are reattached to this Amended Complaint.

83.    Specifically, "the City of Jackson, Mississippi, took the city's Maddox Road Well system (serving much of south Jackson, with 6 groundwater wells along the Highway 18 corridor, and the City of Byram) off the well system and onto surface water."[8]

84.    Jackson's public water system provides water for human consumption to a population of approximately 173,514.

85.    The majority of Jackson's population is Black and nearly 30% of the city's residents are below the poverty line.

86.    Jackson's Public Water System No. MS0250008 consists of two water treatment plants, known as the O.B. Curtis Water Treatment Plant ("O.B. Curtis WTP") and J.H. Fewell Water Treatment Plant ("J.H. Fewell WTP"), as well as a number of groundwater wells and appurtenant collection, treatment, storage, and distribution facilities.

87.    The O.B. Curtis WTP was initially constructed in or around 1992.

88.    The J.H. Fewell WTP was initially constructed in or around 1909.

89.    The O.B. Curtis WTP and the J.H. Fewell FTP have occasionally drawn water from the Ross Barnett Reservoir and the Pearl River in the past.

---

[8]    David T. Dockery & David E. Thompson, Mississippi Dep't of Envtl. Quality, Office of Geology, *Mississippi Environmental Geology*, at 59 (2019), available                    at                    https://www.mdeq.ms.gov/wp-content/uploads/2019/03/EnvironmentalGeologyOfMississippi.pdf.

90.    O.B. Curtis WTP is surface water intake from the Ross Barnett Reservoir.[9]

91.    The J.H. Fewell WTP is surface water intake from the Pearl River.[10]

92.    Like many other American cities, Jackson has an aging network of pipes to deliver drinking water and remove wastewater.

93.    A significant portion of these pipes are made of lead.

94.    It is well known that nearly all homes built before 1980 have lead solder connecting copper pipes and many have pipes made entirely of lead.

95.    More than 70% of the homes in Jackson were built before 1980.

96.    There is a solid band of lead every 20 feet of older cast-iron piping under Jackson's city streets.[11]

97.    In 2016, then-Public Works Director Powell confirmed that even Jackson's cast-iron pipes contain lead joints every twenty feet.

---

[9]    The City of Jackson, Mississippi, 2019 Annual Drinking Water Quality Report, (May 2020).

[10]    *Id*.

[11]    Anna Wolfe, *Jackson Water System Contains Lead Joints*, Clarion Ledger (Mar. 15, 2016), available at https://www.clarionledger.com/story/news/local/2016/03/15/city-water-system-has-some-lead-joints/81780766/.

98.    In 2011, the MSDH tagged Hinds County as "high-risk for lead poisoning" and recognized that "children are especially at risk since their bodies absorb lead more easily" than adults.[12]

99.    "[F]or the 2010 – 2012 monitoring period, [Jackson] reported results of 13.7 ppb. These results were not high enough to exceed the lead [maximum contaminant level ("MCL")[13]] and trigger any mandatory action but should have raised concerns about the potential health risks to system customers."[14]

100.    In contrast, "The 2012 Annual Drinking Water Quality Report for the City of Jackson Maddox Road Well Water System reported lead levels of 2 parts per billion at the 90th percentile."[15]

---

[12]    R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, Jackson Free Press, (Feb. 3, 2016), available at: https://www.jacksonfreepress.com/news/2016/feb/03/jackson-has-long-been-high-risk-lead-poisoning/; *see* MSDH News Release, "Sixteen Counties Identified as High Risk Areas for Lead Poisoning," (Oct. 10, 2011).

[13]    A maximum contaminant level is a required limit of the amount of a toxin (here, lead) in drinking water, established by the U.S. Environmental Protection Agency ("EPA") under the Safe Drinking Water Act ("SDWA"). *See* 40 C.F.R. 141.2 ("Maximum contaminant level means the maximum permissable level of a contaminant in water which is delivered to any user of a public water system."). For lead, the MCL is 15 parts per billion ("ppb").

[14]    Stephanie Otts & Catherine Janasie, Nat'l Sea Grant Law Center, Univ. of Mississippi School of Law, *How Safe is the Water?: An Analysis of the Lead Contamination Risks of Public Water Supplies in the Mississippi Delta*, University of Mississippi School of Law, at 13 (Dec. 2017), https://nsglc.olemiss.edu/projects/lead-contamination/files/howsafeiswater.pdf.

[15]    Dockery et al., *supra* n.5, at 58.

## II.   The Well-Known Chemistry of Low pH on Water Pipes Made of Lead and Other Leaded Components Within Water Infrastructure.

101.   "Typically, lead does not come from a water body or a drinking water treatment plant. Lead gets into drinking water because older pipes could be made of lead or are connected to each other with lead solder. The lead enters the drinking water when these pipes or fixtures begin to corrode or when the water is acidic (low pH)."[16]

102.   pH is a scale of acidity and alkalinity ranging from 0 (the most acidic) to 14 (the most alkaline).

103.   pH is measured on a logarithmic scale, meaning that a pH of one whole number, such as 7.0, is ten times more corrosive than a pH of another whole number, such as 8.0.

104.   "In a high pH value environment, lead and copper pipes build up an oxide layer over time that protect water from lead or copper contamination."[17]

105.   However, when the pH level is not maintained, water becomes more corrosive and causes lead to leach out of pipes.[18]

---

[16]    The University of Mississippi, *Water Quality Challenges in Jackson, Mississippi*,                     available                     at https://olemiss.maps.arcgis.com/apps/MapJournal/index.html?appid=816b40d4f0e 74c6c819dc543fdf3e2cf.

[17]    Dockery et al., *Mississippi Environmental Geology*, *supra* n.5, at 58.

[18]    *See id.*

106.    The MSDH, Water Supply Division, therefore "prefers a pH of 8.5 for public water supplies."[19]

107.    "A water supply with a lower than recommended pH can strip the oxide lining and associated scale in service lines and increase lead levels in the water."[20]

108.    When the pH of a water supply drops, the solubility of lead minerals on the surfaces of pipes increases, leading to higher concentrations of lead in the water supply.[21]

109.    For example, "public water supply after [the City of Flint, Michigan] switched to water from the Flint River; that water after treatment had a pH of 7.4."[22]

---

[19]    *See* Dockery et al., supra n.5, at 58; *see also, e.g.*, *e.g.*, Tam, Y.S., & Elefsiniotis, P. (2009). *Corrosion control in water supply systems: Effect of pH, Alkalinity, and Orthophosphate on Lead and Copper Leaching from Brass Plumbing*. J. of Evntl. Sci. & Health, 44(12), 1251–1260; Eun Jung Kim et. al., *Effect of pH on the Concentrations of Lead and Trace Contaminants in Drinking Water: A Combined Batch, Pipe Loop and Sentinel Home Study*, Water Research, 45(9):2763-74,    March    2011,    available    at https://www.researchgate.net/publication/50987815_Effect_of_pH_on_the_concen trations_of_lead_and_trace_contaminants_in_drinking_water_A_combined_batch _pipe_loop_and_sentinel_home_study.

[20]    *Id.*

[21]    Colin White, Matthew Tancos, and Darren A. Lytle, *Microbial Community Profile of a Lead Service Line Removed from a Drinking Water Distribution System*, Applied and Environmental Microbiology, 2011 Aug; 77(15): 5557–5561, available at http://ncbi.nlm.nih.gov/pmc/articles/PMC3147460/.

[22]    Dockery, supra n.5, at 59.

### III.    The City of Jackson's Well-known Struggles with Low pH.

110.    Jackson has previously struggled with low pH in its water, which makes the water corrosive and therefore more likely to leach lead and other contaminants from pipes into drinking water.

111.    Testing of Jackson's water and water sources has consistently exhibited low pH levels over time.

112.    Mississippi has previously listed certain segments of the Pearl River as impaired due to low pH, which it defines as falling below 6.5 pH. This means that the Pearl River (used as source water for Jackson's drinking water) has been found to be at least 20 times more acidic than the level MSDH prefers for drinking water sources.

113.    Similarly, "[s]urface water from the Ross Barnett Reservoir has a pH of just above 6."[23]

114.    One potential cause of Jackson's bad pH levels in the City's source water is runoff from the surface mining industry—which is prevalent in Mississippi.

115.    Surface mining creates the opportunity for "acid mine drainage" ("AMD") to react with public water supplies across the state.

116.    AMD, a direct result of surface mining, creates a highly acidic chemical reaction in mine-impacted waters associated with metals like iron and aluminum.

---

[23]    *Id.*

117. This reaction causes disastrous outcomes including pollution of drinking water and destruction of infrastructure for hundreds of years.

118. There are currently 591 mines in Mississippi—412 of these are iron mines, 182 are aluminum.[24]

119. "The pH of AMD is usually in the range of 2-6."[25]

120. The acidity of this drainage into the public water supply causes low, hazardous pH levels in surface water.

121. Over the last decade, "a failing lime-feed system at the city's OB Curtis Water Treatment Plant" compounded the City's problems with low pH source water by effectively not treating water drawn from the Reservoir.[26]

122. "Lime is added to regulate the pH of the system's water and reduce the risk of lead leaching from the pipes."

---

[24]    *See* The Diggings, https://thediggings.com/usa/Mississippi (citing Bureau of Land Management data).

[25]    Jerry M. Bigham and Charles A. Cravotta, *Acid Mine Drainage*, Encyclopedia of Soil Science, Third Edition, (2016), available at: https://pubs.er.usgs.gov/publication/70182719#:~:text=The%20pH%20of%20AMD%20is,%E2%80%938)%20are%20also%20common.

[26]    As will be explained further below, MSDH required the City to conduct a corrosion control study in 2015–in the aftermath of Jackson's violations under the Lead and Copper Rule ("LCR"), which "identified a failing lime-feed system at the city's OB Curtis Water Treatment Plant as the likely culprit of the elevated levels of lead." Otts et al., *supra* n.11, at 13.

123.    "The lime-feed system may have been malfunctioning for years due a clogged valve. Insufficient lime was entering the system, resulting in water with a lower pH."

124.    The problem was complicated by the fact that the system was designed for liquid lime, but sometimes used solid lime powder.

125.    Indeed, public officials in Jackson have long known that a key "issue with [Jackson's] water is the pH holding consistency all the way through the system."[27]

126.    Up until August 2014, a significant minority of Jackson's water users (approximately 16,000 connections) did not obtain water drawn from the Pearl River and the Reservoir.

127.    Those users obtained water that was drawn from the Maddox Road Well Water System.

128.    The well water used by the Maddox Road Well Water System in a portion of the Jackson metro area had a high pH (over 8), which "protected service lines connected to the Maddox Road Well system from corrosion and exposure to lead contamination from lead pipes."[28]

---

[27]    Anna Wolfe, *Jackson Hit with Technical Violation for Water Treatment*, Clarion Ledger, June 9, 2016, available at: https://www.clarionledger.com/story/news/local/2016/06/09/jackson-issued-technical-violation-water-treatment/85618558/.

[28]    Dockery et al., *supra* n.5, at 59.

129.   In contrast as above, the surface water "had a pH of just over 6"[29] and this portion of the city's public water system was not prepared for the drastic change in acidic water due to malfunctioning and nonfunctioning corrosion control methods and water treatment.[30]

130.   Jackson's citizens and water users were not warned or informed of the drastic escalation in lead levels (and associated health risks) for the City's public water system at that time.[31]

## IV.   The City of Jackson Sees Alarming Jumps in Lead Contamination in Drinking Water.

131.   Between 2010 and 2013, triennial testing showed an alarming increase of lead Jackson's drinking water.

132.   For the triennial testing period ending December 31, 2009, the lead levels for the surface water system drawn from the Pearl River and the Reservoir (MS0250008) were 4.8 ppb for the 90th percentile and 8.8 ppb for the 95th percentile.[32]

133.   In the triennial testing period ending December 31, 2013, and immediately prior to unitizing the surface water system (MS0250008) with the well

---

[29]   *Id.*

[30]   *See* Section VI, *infra*.

[31]   Indeed, there would be no public warning at all to Jackson's citizens and water users until January 2016.

[32]   *Id*.

water system (MS0250012), the lead level escalated for the surface water system to 13.7 ppb for the 90th percentile and as high as 33.5 for the 95th percentile.[33]

134.   Although the 2013 testing results for the 90th percentile of the surface water system "were not high enough to exceed the lead MCL and trigger any mandatory action," they "should have raised concerns about the potential health risks to system customers."[34]

135.   In contrast, the lead levels for the Maddox Road Well Water System were consistently low, owing to the higher pH of the well water.

136.   For the triennial testing period ending December 31, 2009, the lead level was 1.7 ppb for 90th percentile of the Maddox Road Well Water System results.

137.   For the following triennial testing period ending December 31, 2013, the lead level was again 1.7 ppb for the 90th percentile.

## V.   The City of Jackson Switches Water Sources Despite the Warnings of Former Interim Director of Public Works Bell.

138.   By late 2013 or early 2014, Jackson was aware that its low-pH water (which was not being treated due to the malfunctioning lime pump) was causing lead to leach from pipes into the City's drinking water.

---

[33]     Drinking    Water    Watch    Database,    available    at: https://apps.msdh.ms.gov/DWW/.

[34]     Otts et al., *supra* n.11, at 13.

139.    At that time, then-Interim Director of Public Works Bell told the then-mayor, Lumumba Sr., that there were "issues with the water's pH," stressed Jackson's need to alter its corrosion control treatment method, and brought a proposal to Jackson officials.

140.    Bell's presentation to Lumumba Sr. directly connected Jackson's pH issues with its increasing lead levels and explained that low pH environments cause lead to leach out of pipes.

141.    Bell explained that the MSDH had previously identified Jackson as being at high risk for lead poisoning in children because it was extremely likely that Jackson had lead service lines for distributing drinking water, and that the vast majority of Jackson's homes had pipes that were partially or completely made of lead.

142.    Bell explained the potential risks associated with lead in drinking water, particularly as they relate to children.

143.    Prior to his presentation to Mayor Lumumba Sr., Bell asked Cynthia Hill ("Hill"), who ran Jackson's water treatment plants, to estimate the cost of the repairs, including the cost to switch to a liquid lime treatment to improve corrosion control.

144.    Hill estimated necessary repairs would cost approximately $400,000.

145.    Bell shared the $400,000 figure with Mayor Lumumba Sr.

146.    The repair Bell identified was to a defective lime injection pump in the O.B. Curtis Water Treatment Plan that had been malfunctioning.

147.    Bell cautioned Mayor Lumumba Sr. against taking actions that might shock Jackson's public water system.

148.    Bell informed Mayor Lumumba Sr. that some of Jackson's erstwhile sources of drinking water (including the Pearl River and the Reservoir) had very low pH levels.

149.    Mayor Lumumba Sr. understood all of this and decided to take action to protect Jackson's citizens and water users.

150.    As current Mayor Lumumba Jr. stated in a July 18, 2018 Press Release: The City of Jackson "learned that there were troubles or issues with the water treatment facility being able to maintain a proper pH through what we had as a liquid lime system at that time."[35]

151.    At that time, Mayor Lumumba Sr. "took action to incorporate that in the budget to purchase a new system."[36]

152.    Mayor Lumumba Sr. passed away on or about February 25, 2014.

153.    In April 2014, Yarber was elected to finish Lumumba Sr.'s term.

---

[35]    Press Release, City of Jackson (July 18, 2018), attached as Exhibit 2 and incorporated as if fully stated herein.

[36]    *Id.*

154.   Former Mayor Yarber served as a member of Jackson's City Council prior to becoming Mayor.

155.   Indeed, former Mayor Yarber had previously served as a vice mayor and was a member of the City Council's budget committee in the Spring of 2014.

156.   Then-Council Member Yarber was present for and aware of Bell's presentation to Lumumba Sr. regarding the City's corrosion control system and the urgent need for upgrades.

157.   Former Mayor Yarber (as a then-member of the Jackson City Council and member of the Jackson City Council's Budget Committee) was present for and understood Bell's presentation to Lumumba Sr.

158.   In other words, Mayor Yarber was aware (both when he was a Council Member and later as Mayor) that Jackson's water treatment plants were incapable of adequately treating the water to ensure that it had a pH level necessary to prevent corrosion of Jackson's water pipes, including its lead water pipes, and therefore necessary to prevent lead from leaching into Jackson's drinking water.

159.   Although he was aware of the Jackson's serious need for a corrosion control system and other upgrades—and understood the reasoning of why former Mayor Lumumba Sr. had put them in the budget (based on Bell's urgent warnings)—Former Mayor Yarber removed those projects from the City's budget.[37]

---

[37]    Exhibit 2.

160. All the while, the City continued to ignore alarms regarding malfunctioning and nonfunctioning corrosion control treatment methods.

161. Additionally, shortly after former Mayor Yarber was elected, he replaced Bell—who had sounded the alarm about the low pH, high corrosivity, and lack of corrosion control at Jackson's water treatment plants—and installed Powell as Jackson's Public Works Director.

162. Several high-ranking figures in Jackson's government—including but not limited to Mayor Lumumba Sr., former Interim Public Works Director Bell, then-current Mayor Yarber, and then-current Public Works Director Powell—were thus aware of the low pH of the water and the increasing lead levels in the previous year's testing.

163. Powell and Yarber were also aware that the surface water drawn from the Pearl River and the Reservoir had a very low pH level.

164. Yet, despite these urgent concerns, and the obvious risk of harm they carried, Jackson did not take any action to address rising lead levels in Jackson's water.

165. Despite the fact that the then-existing corrosion control methods in place at the O.B. Curtis Water Treatment Plant were inadequate, not performing, and in fact malfunctioning and not functioning for years, no corrosion control improvements were made to Jackson's water treatment plants at that time.

166.   As a public water system professional, Defendant Powell knew that several segments of the Pearl River had been identified as impaired due to low pH levels and shared this information with former Mayor Yarber.

167.   Both Powell and Yarber – in their capacity as public servants – chose to direct their staff to carry out the most harmful and neglectful options for the corrosion control methods.

168.   To this day, Jackson has not identified any materials, studies, reports, documents, treatises, or other information that was relied upon in good faith by former Mayor Yarber, former Public Works Director Powell, or Jackson in taking no action to address the pH levels of the source water or corrosion control methods at the O.B. Curtis Water Treatment Plant.

169.   Indeed, despite the fact that room was already made in the budget for such improvements, the budget items were cut, and no improvements were made at this time.

170.   Ultimately, former Mayor Yarber's, former Public Works Director Powell's, and Jackson's decision proved catastrophic. As described below, it caused a serious increase in lead levels that would not be detected until June 2015 and would not be reported until January 2016. Jackson would not even begin to address those levels until later in the spring of 2016. Even to this day, Jackson is not fully in compliance with federal law.

171.    Two years later, after the discovery of dangerous lead levels exceeding the LCR's 15 ppb action level, former Interim Public Works Administrator Bell told the City Council in 2016 that "had that [the project to update the water treatment plant's corrosion control system] been done [years earlier as Bell had suggested], we would not have that inconsistency [in lead levels]."[38]

172.    Bell stated, "With this water system, the real issue with our water is the pH holding consistency all the way through the system."[39]

173.    Likewise, an anonymous employee of the Public Works Department stated that the corrosion could be attributed to the outdated lime injection system used to regulate the pH of the water.[40]

174.    Then-Public Works Director Powell essentially agreed and admitted that Jackson's issue with lead "stems from the fact that our corrosion control system at the plan needs to be upgraded, optimized."[41]

---

[38]    Anna Wolfe, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, Clarion Ledger, (Mar. 23, 2016), available at https://www.clarionledger.com/story/news/local/2016/03/22/offering-jackson-water-solutions-new-treatment-needed/82120680/.

[39]    Wolfe, *Jackson Hit with Technical Violation for Water Treatment*, *supra* n.24.

[40]    Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, Jackson Free Press, (Mar. 16, 2016), https://www.jacksonfreepress.com/news/2016/mar/16/water-turns-city-wrestles-over-corrosion-study/.

[41]    Kate Galbraith, *High Levels of Lead Found in Mississippi Capital's Water Likened to Flint Crisis*, The Guardian, (Mar. 17, 2016),

175.    In addition to the fact that no action was taken to combat the rapidly rising lead levels, former Mayor Yarber, former Public Works Director Powell, and the City of Jackson did not warn Jackson's citizens and water users of rising lead levels, the corrosive state of Jackson's water, or the associated health risks for children.

## VI.    Yarber and Powell Made the Situation Worse by Switching from High-pH Well Water to Low-pH Surface Water for a Substantial Portion of Jackson Water Users, Causing a Shock to the Jackson Public Water System.

176.    Simultaneously with Yarber's and Powell's rising lead levels, Jackson switched a section of the city's water source from well water to surface water.

177.    The City of Jackson switched these water users to surface water drawn from the Pearl River and the Reservoir.

178.    Specifically, "the City of Jackson, Mississippi, took the city's Maddox Road Well system (serving much of south Jackson, with 6 groundwater wells along the Highway 18 corridor, and the City of Byram) off the well system and onto surface water."[42]

---

https://www.theguardian.com/us-news/2016/mar/17/high-levels-lead-mississippi-water-flint-michigan.

[42]        Dockery et al., *supra* n.5, at 58.

179.   Jackson, as authorized and directed by Powell and Yarber, switched water sources for a portion of its water users from the high-pH well water to the low-pH surface water drawn from the Pearl River and the Reservoir

180.   The decision was a catastrophic one for thousands of Jackson water customers given the fragile balance of pH then in place in Jackson's public water systems.

181.   The well water used by the Maddox Road Well Water System in a portion of the Jackson metro area had a high pH (over 8), which "protected service lines connected to the Maddox Road Well system from corrosion and exposure to lead contamination from lead pipes."[43]

182.   The surface water "had a pH of just over 6"[44] and this portion of the city's public water system was not prepared for the drastic change in acidic water due to malfunctioning and nonfunctioning corrosion control methods and water treatment.

183.   As a public water system professional, Defendant Powell knew that several segments of the Pearl River had been identified as impaired due to low pH levels and shared this information with former Mayor Yarber.

---

[43]     *Id*, at 59.
[44]     *Id.*

184.   Indeed, as a public water system professional, former Director of Public Works Powell in fact knew of the seriously low pH of the surface waters Jackson was switching to, as well as the fact that certain segments had previously been designated impaired for low pH pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

185.   Further, in her capacity as a public water system professional, Powell knew of the seriously impaired, malfunctioning and nonfunctioning corrosion control methods within the city's water treatment plants.

186.   Powell shared this information with former Mayor Yarber.

187.   Both of these public servants chose to direct their staff to carry out the most harmful and neglectful options for the well-water switch as well as the corrosion control methods.

188.   The O.B. Curtis and J.H. Fewell Water Treatment Plants were not prepared to handle the increased flow associated with a sudden addition of 16,000 new connections.

189.   Ultimately, former Mayor Yarber's, former Public Works Director Powell's, and Jackson's decision proved catastrophic. As described below, it caused a serious increase in lead levels that would not be detected until June 2015 and would not be reported until January 2016. Jackson would not even begin to address those

levels until later in the spring of 2016. Even to this day, Jackson is not fully in compliance with federal law.

190.   To this day, Jackson has not identified any materials, studies, reports, documents, treatises, or other information that was relied upon in good faith by former Mayor Yarber, former Public Works Director Powell, or Jackson in making the decision to switch water sources for nearly a quarter of its water users.

191.   There was no information or studies that supported the advisability of the switch or suggested that it would be safe under the circumstances.

192.   No studies regarding the cost of a switch were conducted and no information or analysis supported later claims that the switch was taken as a cost-saving measure.

193.   No internal materials were created or reviewed by former Mayor Yarber's office, the Jackson City Council, or the Department of Public Works that supported the switch, suggested it would be safe, suggested it would be a valid cost-saving measure, or was advisable in any way.

194.   To this day, Jackson has not identified any materials, studies, reports, documents, treatises, or other information that was relied upon in good faith by former Mayor Yarber, former Public Works Director Powell, or Jackson.

195.   No other actions were taken to ensure that a switch in Jackson's drinking water source would be safe and would not result in the injury and poisoning of Jackson's citizens and water users.

196.   Jackson's citizens and water users were not warned or informed of the associated risks from rising lead levels in drinking water while the city continued to ignore alarms regarding malfunctioning and nonfunctioning corrosion control treatment methods.

## VII.   High Concentrations of Lead Are Detected in Jackson's Drinking Water in June 2015.

197.   On or about June 23 and 24, 2015, officials from the MSDH performed water testing in Jackson required by the Safe Drinking Water Act ("SDWA").[45]

198.   The MSDH found that levels of lead in Jackson's drinking water exceeded the LCR's 15 ppb action threshold in 22% of Jackson homes, according to the sampling.[46]

199.   The MSDH has been delegated authority for primary enforcement of the SDWA pursuant to SDWA section 1413, 42 U.S.C. § 300g-2. As such, it has primary responsibility for the public water supply program in Mississippi.

---

[45]   Lead Testing Results, June 2015, https://jacksonfreepress.media.clients.ellingtoncms.com/news/documents/2016/02/04/0250008_PB_2015_with_ReSample_Results_1.pdf.

[46]   Galbraith, *supra* n.38.

200.   In July 2015, the MSDH internally confirmed its finding of high lead levels in Jackson's drinking water at 22% of Jackson homes.

201.   This was a larger proportion of homes with lead in excess of the LCR's 15 ppb threshold than found in Flint, Michigan at about that time (16.7%).[47]

202.   The 90% percentile of testing in June 2015 was 28 ppb, nearly twice the EPA's action level of 15 ppb.

203.   The lead levels the MSDH detected in June 2015 were likely higher and more widespread, and therefore more dangerous.

204.   The MSDH employees who conducted the testing (John Does 1–20) at residential homes within the City of Jackson directed residents to "gently" run the tap for the test.

205.   Prior to February 2016, MSDH guidelines instructed those taking samples to run water slowly, which causes less lead to be dislodged from pipes.[48]

206.   Running the tap more gently or more slowly reduces the water flow.

207.   The amount of lead particles released into the water is proportional to the water's flow rate.

---

[47]   *Id.*

[48]   *See* Anna Wolfe, *State Refutes Report Jackson Cheated in Lead Water Test*, Clarion-Ledger (June 3, 2016), https://www.clarionledger.com/story/news/local/2016/06/03/mississippi-changes-lead-testing-better-epa-compliance/85310430/.

208.   Thus, a slower flow rate reduces the amount of lead in water and is thus a more conservative test for identifying lead.

209.   However, the slow flow rate the MSDH directed during testing is inconsistent with how the average water user fills a glass of water for drinking or a pot for cooking.

210.   Indeed, most water users fill glasses of drinking water or pots of cooking water by fully opening the tap.

211.   The MSDH's direction regarding testing methodology was directly counter to well-known 2008 guidance from the EPA "that homeowners collecting samples should use their water as they would normally, with the exception that the regulations require the water to stagnate for a minimum of six hours prior to collection of the sample."[49]

212.   If the correct methodology (in compliance with the EPA's 2008 guidance) had been followed, additional homes in the 2015 and 2016 sampling periods would have exceeded the LCR's action level of 15 ppb of lead, and the levels in homes would have been higher overall.

213.   Defendant Craig knew of the EPA's 2008 guidance.

---

[49]    *See* Letter from Cynthia C. Dougherty, EPA Office of Ground Water and Drinking Water, to Ralph Scott, Alliance for Healthy Homes (Sept. 12, 2008), attached hereto as Exhibit 3 and incorporated as if fully stated herein.

214.    Defendant Craig crafted the MSDH's directions on testing methodology to yield generally lower results and ensure broader "compliance" with the LCR.

215.    Indeed, the use of testing methodologies calculated to yield lower lead testing results (and thereby a higher likelihood of compliance with the LCR) was widespread across the United States for precisely this reason.[50]

216.    At least three officials were criminally indicted for using a similar testing methodology during the Flint, Michigan water crisis.

217.    Upon information and belief, Defendant John Does 1-20 also ran the water for several minutes prior to taking a water sample. This technique is known as "pre-flushing" or "pre-stagnation flushing."

218.    Pre-flushing is recommended for water users because the flushing period (usually a few minutes) removes some of the lead particles that have built up in the pipes.

219.    However, it is well known that pre-flushing yields artificially low lead levels in testing results; indeed, it is well known that pre-flushing is a technique that can be (and has been) used to manipulate lead testing.

---

[50]    Oliver Milman and Jessica Glenza, *At Least 33 US Cities Used Water Testing 'Cheats' Over Lead Concerns*, The Guardian (June 2, 2016), https://www.theguardian.com/environment/2016/jun/02/lead-water-testing-cheats-chicago-boston-philadelphia.

220.   In a February 2016 letter, the EPA noted that pre-flushing "may potentially lower the lead levels as compared to when it is not practiced. Flushing removes water that may have been in contact with the lead service line for extended periods, which is when lead typically leaches into drinking water."[51]

221.   The EPA's February 2016 letter was sent because the EPA understood the widespread nature of evasive testing techniques like slowing the flow of water and pre-stagnation flushing prior to the collection of water samples. The letter was a reminder to authorities like the MSDH that those techniques did not comply with federal law and EPA guidelines.

222.   Indeed, the results may imply that the water system is in compliance with the LCR (thereby supporting claims by the municipal government that the water is "safe" to drink) even though it is really not in compliance with the LCR (and the water is not safe to drink).

223.   In other words, pre-flushing and gently running the tap conceals and/or understates the existence and extent of lead contamination in public drinking water.

224.   The decision to include pre-flushing and gently running the tap as components of water testing was authorized and directed by MSDH Senior Deputy Craig.

---

[51]   Letter from Peter C. Grevatt, Director, EPA Office of Ground Water & Drinking Water to Water Division Directors Regions I – X (Feb. 29, 2016), attached hereto as Exhibit 4, and incorporated as if fully stated herein.

225.   At the time MSDH Senior Deputy Craig made this decision, he knew or should have known that pre-flushing and gently running the tap were not accepted practices—and were in fact inconsistent with clear EPA guidance on proper testing methodology.

226.   If Craig had directed the MSDH Employees (including John Does 21 through 40) to use a correct methodology that complied with the EPA's guidance and reflected how actual water users draw water from the tap, then the results would have been higher.

227.   Additionally, the 2014 Annual Drinking Water Quality Report for the City of Jackson Water System (which reported that Jackson's lead levels at the 90th percentile were 14 ppb) likely underreported lead levels as well.

## VIII.  Residents and Water Users of Jackson Were Not Warned Until the End of January 2016.

228.   Despite finding seriously high lead levels exceeding the LCR's action level of 15 ppb in 22% of Jackson's homes, MSDH officials did not inform the City of Jackson's residents and water users at that time.[52]

---

[52]   The City of Jackson claims not to have received notice of the MSDH's findings until January 2016. However, in August 2015, the City of Jackson switched its water source back to the well system. Years later, the City attempted to justify its return to the well system by stating that there were "unavoidable equipment malfunctions" and "water main pressure issues." *See* 2018 Certification, Consumer Confidence Report, City of Jackson, (June 28, 2019), https://msdh.ms.gov/ccr/2018/135763.pdf.

229.    There was no warning of any kind to Jackson's citizens and water users until at least January 2016.

230.    Since impurities like lead are impossible to detect with the naked eye, there would have been no way for Jackson's citizens and water users to protect themselves without a warning from the MSDH or City of Jackson.

231.    On or about January 29, 2016, the MSDH notified the Jackson that it found lead in 22.4 percent of the 58 Jackson homes it sampled in June 2015.

232.    Despite knowing of the high levels of lead in Jackson's water, neither the MSDH nor Jackson had taken any action in the previous seven months to protect Jackson's citizens and water users.

233.    The only reason MSDH officials eventually provided for not warning Jackson or Jackson's residents and water users was that federal law does not require the MSDH to notify the City or its residents and water users of potential hazards.

234.    In a January 29, 2016 press conference, MSDH Senior Deputy Craig claimed that the elevated lead levels found in the June 2015 testing weren't reported to the city until January 2016 because the MSDH was following EPA guidelines requiring a six-month monitoring period after lead levels have been shown to be above the federal action level (similar if not identical to the excuses made by city and state officials in Flint, Michigan).

235.   This explanation grossly distorts the EPA guidelines, which in no way prohibit entities like the MSDH from notifying municipalities of threats to public health. In fact, the EPA's regulations in the LCR contemplate that the public shall be informed of lead exceedances as soon as practicable. *See* 40 C.F.R. § 141.85(d)(2).

236.   Not only do the EPA's LCR regulations not prohibit the MSDH from notifying the City of Jackson sooner, the MSDH had a duty under Mississippi common law and the Fourteenth Amendment to notify Jackson and warn its residents.

237.   Furthermore, the EPA guidelines Craig was referring to merely relate to follow up testing and do not require a delay in warning a municipality or its citizens when the municipality's drinking water contains dangerously elevated lead levels.

238.   MSDH Senior Deputy Craig did not rely upon any reasoned analysis of the LCR or the EPA's guidelines. In other words, the explanation he gave on January 29, 2016 was either unacceptably ignorant or knowingly false.

239.   More importantly, MSDH Senior Deputy Craig's decision to intentionally withhold critical public health information demonstrates a shocking and reckless disregard for the health and safety of the people of Jackson.

240.    No reasonable person—let alone a reasonable person charged with protecting public health, including in emergency situations such as this one—would believe it was appropriate or defensible to wait more than six months to warn water users that their drinking water is dangerously contaminated with toxic lead. This omission is particularly outrageous in light of the fact that lead in drinking water is highly poisonous to children and can cause serious and lifelong injuries yet is virtually undetectable by natural human senses.

241.    On the contrary, given the near certainty of permanent and life-altering harm to children, failure to warn Jackson's citizens and water users of the lead in Jackson's drinking water (latent to the users; confirmed to the MSDH officials like Craig) constitutes conscience-shocking deliberate indifference.

242.    The decision to delay warning Jackson and/or Jackson's citizens and water users about the presence of significantly high levels of lead in Jackson's drinking water was made and directed by Craig.

243.    Even after announcing the elevated lead levels in Jackson's drinking water, Craig did not issue a warning for children and pregnant women until approximately February 25, 2016.

244.    Craig's decision not to warn Jackson's citizens and water users was unjustifiable and caused an unnecessary prolonging of the Jackson water crisis.

245.  At the time Craig announced the presence of dangerously high levels of lead in Jackson's water, he acknowledged that the water would not be safe to drink, even in the best of conditions, for another six to nine months.

246.  It is well known that the amount of lead that leaches into drinking water is affected by temperature and seasonal variation.

247.  It is well known among public water system professionals and public health professionals that less lead is expected to leach from pipes into drinking water in fall and winter months.

248.  Because less lead leaches into drinking water during the colder fall and winter months, Craig's decision not to warn Jackson and/or its citizens and water users of the presence of lead in Jackson's drinking water prevented any action to curtail the amount of lead in Jackson's drinking water during a time when it may have been easier to solve the problem.

249.  In any event, as Craig's own statement following the revelation of hazardous lead in Jackson's drinking water shows, any delay in warning Jackson and/or its water users causes a delay in the time in which it will become safe to drink the water again.

250.  In other words, more children have been exposed to toxic and dangerous bacteria in Jackson's drinking water, and for longer periods of time, than

if Craig had warned Jackson and its citizens and water users when he became aware of the problem.

## IX.  The Jackson Defendants' False and Misleading Statements Suggesting Jackson's Water Was Safe to Drink When It in Fact Was Not.

251.  The Jackson Defendants—most prominently Yarber, Powell, and official statements made on behalf of Jackson—made numerous false statements, either explicitly asserting or otherwise strongly implying, that Jackson's water was safe to drink when it in fact was not.

252.  Even though she acknowledged there were issues with lead in Jackson's drinking water, Interim Jackson Public Works Director Powell nevertheless stated to the Jackson Free Press that "This is not a situation where you have to stop drinking the water."[53]

253.  Indeed, she made repeated statements reassuring the City of Jackson's citizens and water users that Jackson's water was safe to drink even though it was not.

254.  On January 29, 2016, Powell immediately told the public that the June 2015 findings of lead above the LCR's action level for lead in Jackson's drinking

---

[53]    Nave, *supra* n.9.

water "[do] not mean that the city has violated the Safe Drinking Water Act, and our water is safe."[54]

255.   Powell also sought to persuade Jackson's citizens and water users that Jackson's water crisis was unlike Flint's drinking water crisis. "A major difference between Flint, Mich., and Jackson, Miss., Powell said, is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does."[55]

256.   Powell also falsely claimed that "We are nowhere near the levels seen in Flint."[56] This statement was false; if anything, there were a larger proportion of homes that had shown elevated lead levels above 15 ppb. Powell made the statement

---

[54]    Anna Wolfe & Sara Fowler, *Jackson, MSDH Report Lead Detection in City Water*, The Clarion-Ledger (Jan. 29., 2016), https://www.clarionledger.com/story/news/local/2016/01/29/small-amount-lead-some-jackson-residents-water/79510298/.

[55]    Anna Wolfe, *Jackson City Council Talks Lead Water*, Clarion Ledger (Feb. 19, 2016), https://www.clarionledger.com/story/news/local/2016/02/17/jackson-city-council-talks-lead-water/80538910/. As above, this claim was false: the City of Jackson did not have properly operating corrosion control measures. Furthermore, Powell's false statement ironically mirrored a false statement regarding the existence of corrosion control in Flint, Michigan by a Michigan Department of Environmental Quality supervisor, Steven Busch, which the Sixth Circuit concluded was a conscience-shocking misrepresentation that prolonged and exacerbated the effects of the water crisis there. *See Waid v. Earley (In re Flint Water Cases)*, 960 F.3d 303, 317, 328 (6th Cir. 2020).

[56]    Lisa Riordan Seville, Hannah Rappleye, Tracy Connor and Stephanie Gosk, *'People are Scared': Jackson, Mississippi Copes With Lead Alarm*, NBC News (Feb. 25, 2016), https://www.nbcnews.com/news/us-news/people-are-scared-jackson-mississippi-copes-lead-alarm-n525961.

to assuage any concerns by Jackson's citizens and water users and persuade them that the water was safe to drink.

257.   In making this knowingly false statement, Powell induced Jackson's citizens and water users to take actions that were dangerous to their health and the health of their children and to avoid taking actions that might mitigate that harm.

258.   Former Mayor Yarber echoed Powell, emphatically saying: "I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint."[57]

259.   Yet, by January and February 2016, appropriate warnings to Jackson's citizens and water users were actually already long and tragically overdue, and the public alarm should have been ringing loudly. Indeed, by that time, MSDH officials, under the direction of Craig, had already wrongfully delayed warning Jackson's citizens and water users of the threat of lead poisoning for more than six months.

260.   Moreover, by that time, the comparison to the tragic water crisis was unmistakable, and Powell's and Yarber's emphatic and repeated comments were clearly intended to downplay the water crisis in Jackson and persuade Jackson's citizens and water users that Jackson's water was safe to drink.

---

[57]    Anna Wolfe, *Jackson City Council Talks Lead Water*, *supra* n.52.

261.   Powell also claimed that "There is no lead in the drinking water as it leaves the plant."[58]

262.   Although this statement may be true in one sense, since lead is rarely in source water and therefore unlikely to be in the drinking water as it leaves the plant, the statement is deliberately misleading since it conveys the overall impression that there is no lead in the water at all, when testing in fact confirmed that there was.

263.   There is no question that Defendant Powell understood the basic fact of water chemistry that low pH water can be corrosive and therefore leach lead out of drinking water pipes long after it leaves a municipal water treatment plant.

264.   Nevertheless, Powell repeatedly attempted to cast doubt on the possibility that Jackson's water crisis was a widespread problem, claiming that "the problem with the lead was happening at specific homes with lead pipes, and that the water leaving the treatment plant was not contaminated."[59]

265.   That statement was false; within months, a Jackson Public Works Department employee would discover that even the city's cast-iron water lines had solid bands of lead every twenty feet.[60] At the time Powell made the false statement,

---

[58]   *Id.*

[59]   David Kenney, *Jackson City Council Tables Water Emergency*, WLBT3 (Mar. 1, 2016), https://www.wlbt.com/story/31360020/council-tables-water-emergency/.

[60]   The employee blew the whistle and warned the Jackson community of the widespread potential for Jackson's corrosive, low pH water to leach lead broadly

it was (at best) made in reckless disregard of the truth; days earlier, Powell herself had claimed that "there are no records showing whether there are any lead lines underground."

266.    Beyond Powell and Yarber, other Jackson officials also told the press and public that Jackson's drinking water is "not unsafe" to drink.

267.    Those other Jackson officials spoke with the permission of, and at the direction of, Defendants Yarber and Powell.

268.    These statements were false.

269.    For instance, at the time Powell said Jackson's citizens could drink the water, 11% of Jackson homes were still testing above the LCR's 15 ppb threshold for lead. Indeed, testing in January 2016 showed that additional residences served by Jackson's public water system were testing at dangerously elevated lead levels, signaling that the problem was not contained or limited to certain residences.

270.    Moreover, the lead levels at that time showed that the corrosion of lead piping caused by Jackson's water was grave and serious. In January and February 2016, one Jackson home at that time tested positive for lead with 476 ppb, more than 30 times the EPA's action level of 15 ppb.

---

and poison children throughout the City and the larger public water system. Powell immediately fired the employee for reporting the threat to the public.

271.    Other homes tested at 106 ppb, 62 ppb, 58 ppb and 50 ppb. These levels, found consistently throughout different homes in Jackson, showed that Jackson's water crisis was if anything more dangerous and more widespread than the water crisis in Flint.

272.    False statements of essentially the same character would continue over time. For example, Defendant Miller echoed Defendant Powell in a deliberately misleading statement from July 2018, saying "there's been no detecting of lead or copper in the water supply."[61]

273.    Although this statement may be true in one sense, since lead is rarely in source water and therefore unlikely to be in the drinking water as it leaves the plant, the statement is deliberately misleading since it conveys the overall impression that there is no lead in the water at all, when testing in fact confirmed that there was.

274.    Indeed, it is beyond a doubt that Defendant Miller (like Defendant Powell before him) understood the basic fact of water chemistry that low pH water can be corrosive and therefore leach lead out of drinking water pipes long after it leaves a municipal water treatment plant.

---

[61]    Justin Vicory, *Department of Health Says Jackson Is in Violation of Safe Drinking Water Requirements*, Clarion-Ledger (July 18, 2018), http://www.clarionledger.com/story/news/local/2018/07/18/Jackson-violating-safe-drinking-water-requirements-health-dept/798010002/.

275.   Also in July 2018, despite the fact that Jackson had just been cited with yet another technical violation for its failure to comply with the Compliance Plan the MSDH put in place for it in 2016, Defendant Miller assured Jackson's citizens water users that "[t]he water is still safe to drink."[62]

## X.   The MSDH Issued a Compliance Plan to Jackson, Which Jackson Repeatedly Fail to Comply With.

276.   In February of 2016, the Mississippi State Department of Health issued a compliance plan for the City.[63]

277.   One item required by the compliance plan was an "engineer-designed corrosion control study and plan for optimization of water treatment."[64]

278.   Jackson was also required to submit "an engineer-designed corrosion control study and plan for optimization of water treatment for the City of Jackson Water System." The compliance plan contemplated that once the corrosion control plan was deemed sufficient by MSDH, the corrosion control plan "will be monitored by the City of Jackson assigned engineer(s)" as well as the MSDH.

---

[62]   Marie Weidmayer, *City Violated Water Treatment Procedure, Still Safe to Drink*, Jackson Free Press (July 19, 2018), http://www.jacksonfreepress.com/news/2018/jul/19/city-violated-water-treatment-procedure-still-safe/.

[63]   *See* Otts, et. al., *supra* n.11.

[64]   Compliance Plan for City of Jackson (MS0250008), attached hereto as Exhibit 5 and incorporated as if fully stated herein.

279.    Until the plan was approved by MSDH, however, Jackson "must ensure functional treatment of water in the current system to maintain a constant pH of at least 8.5 and alkalinity of between 50 mg/l and 70 mg/l. Repairs or modifications to the City of Jackson Water System to establish these values must be completed as soon as possible but no later than October 1, 2016."

280.    Additionally, Jackson was required to "update the City of Jackson Water System Lead/Copper Site Plan. The plan must be designed and monitored by an engineer and provided to the MSDH Bureau of Public Water Supply. The plan must include a map with all sampling locations, intakes, wells, treatment plants, storage tanks, and booster stations. The plan and map must be submitted to the Director of the MSDH Bureau of Public Water Supply or before March 15, 2016."

281.    Jackson was also required to "submit a written summary of activities related to all areas identified in this Compliance Plan to the Director of the MSDH Bureau of Public Water Supply by the 15th of each month, beginning March 15, 2016."

282.    Jackson immediately and repeatedly failed to comply with the Compliance Plan.

283.    A follow-up letter dated March 22, 2016 noted in several places that the City had requested (and was granted) extensions. The follow-up letter also noted that

Jackson had failed to comply (or had insufficiently complied) with the Compliance Plan's other dictates.

284.    The Corrosion Control Plan called for the installation of certain equipment that would help raise pH and reduce corrosion from Jackson's distribution lines.

285.    An estimate of the cost to fix the problem had already been completed. Mayor Lumumba Jr.'s office estimated that fixing the crisis would cost $1,000,000 to $1,200,000.

286.    The City of Jackson did not begin installing necessary components for optimized corrosion control until at least October 2017.

287.    Furthermore, the City was cited with a technical violation in July 2018.

288.    The City revealed the technical violation, in a statement by Director of Communications Candice Cole: "In an effort to maintain trust and transparency with those we serve, we must inform you that it has come to our attention that for six months, our water system has failed to consistently meet the minimum pH required by our optimized control plan for the City of Jackson."[65]

289.    In other words, more than two years after the MSDH reported finding serious lead levels that exceeded the action level of 15 ppb under the LCR, the

---

[65]    Weidmayer, *supra* n.59.

Jackson had "consistently" failed to maintain the pH level necessary to prevent further leaching of lead.

290.   A recent information request revealed numerous emails documenting a multi-year failure by Jackson to take the necessary actions to come into compliance with the February 2016 compliance plan, even to present day.[66]

## XI.   Low pH and Lead Contamination Issues Continue Throughout 2016 and After.

291.   The corrosive and dangerously low pH of Jackson's drinking water continued throughout 2016.

292.   As of 2016, "Jackson's water ha[d] a low pH that fluctuates often," ranging "from 6.5 to 7.5" as it leaves the water treatment plant."[67]

293.   "One relatively new downtown building in Jackson had tap water with a consistent pH of 6.3 for 2016."[68]

---

[66]     *See* Steve Wilson, *EPA Emails Reveal City's Continued Violations*, The Northside Sun, https://www.northsidesun.com/local-news-top-stories/epa-emails-reveal-citys-continued-violations#sthash.zt33DM8L.JWEPdmmP.dpbs.

[67]     Anna Wolfe, *6 Things to Know About the Lead Water in Jackson*, Clarion       Ledger       (Mar.       17,       2016), https://www.clarionledger.com/story/news/local/2016/03/17/5-things-know-lead-water-jackson/81830278/.

[68]     *See* Dockery et al., *supra* n.5, at 58.

294.    In follow-up testing taken in August 2016, several Jackson homes again reported very high lead levels—123 ppb, 90 ppb, and 86 ppb.[69]

295.    In the August 2016 testing, 13 out of 120 homes (nearly 11%) had elevated lead levels.[70]

## XII.    MSDH, Craig, and Jackson Advise Jackson Residents to Boil Their Drinking Water, Which Actually Increases Lead Concentration and Makes Water Less Safe to Drink.

296.    In February 2016, Craig warned small children and pregnant women not to consume tap water without boiling it for six months.

297.    Likewise, Jackson issued several boil water notices from the spring of 2016 to 2020.

298.    This advice was dangerously ignorant. Boiling water exacerbates lead toxicity because the water boils off and evaporates but the lead does not, leading to a higher concentration of toxic lead in the resulting drinking water.

---

[69]    Anna Wolfe, *A Year Later, Jackson's Lead-Water Issue Not Solved*, Hattiesburg American (Dec. 13, 2016), https://www.hattiesburgamerican.com/story/news/local/2016/12/13/year-later-jackson-lead-water-issue-solved/95401880/.

[70]    Anna Wolfe, *Jackson Is Still Experiencing Elevated Lead Levels in Water*, Hattiesburg American (Sept. 13, 2016), https://www.hattiesburgamerican.com/story/news/local/2016/09/13/jackson-still-experiencing-elevated-lead-levels-water/90302838/.

**XIII.  Defendant Powell Fires a Whistle-Blower Who Sought to Warn Jackson's Citizens and Water Users of the Presence of Lead Joints in Jackson's Water Distribution Lines.**

299.   In February 2016, Jonathan Yaeger, an engineer-in-training with the Jackson Public Works Department, found lead materials during a water main replacement job.

300.   Yaeger took his concerns to officials in his department, even offering to address the City Council, but they discouraged him from doing so.

301.   Yaeger spoke to a local reporter about having found lead during the water main replacement job.

302.   Defendant Powell fired Yaeger from the Public Works Department for "possibly creating unwarranted public fear."[71]

**XIV.  Jackson Hires Trilogy Engineering Services LLC, Which Makes the Situation Worse.**

303.   In February 2016, MSDH required Jackson to enter into a compliance plan to achieve compliance with the LCR.

304.   The compliance plan required Jackson to, *inter alia*, "identify an individual or firm providing professional engineering service to the City of Jackson for drinking water matters and provide the name or firm by written notice to the

---

[71]    KARE Staff, *Water Worker Fired After Talking About Lead to Media* (Mar. 29, 2016), https://www.kare11.com/article/news/nation-now/water-worker-fired-after-talking-about-lead-to-media/108980682.

Director of the MSDH Bureau of Public Water Supply on or before February 22, 2016."[72]

305.   In April 2016, Jackson approved a contract with Trilogy Engineering Services to conduct a corrosion control optimization study.[73]

306.   Although the City Council initially rejected Trilogy in a vote on March 12, 2016, the City Council approved the contractor for the project on April 5, 2016 and used an emergency loan from the state to pay for the project.[74]

307.   Trilogy Engineering Services is owned and managed in part by Thessalonian LeBlanc.[75]

308.   LeBlanc held an unreported campaign fundraiser for Yarber in 2014.[76]

309.   Trilogy was hired to, among other things, conduct a corrosion control study regarding how to come into compliance with the SDWA.

---

[72]   Exhibit 5.

[73]   Anna Wolfe, *Jackson Is Still Experiencing Elevated Lead Levels in Water*, *supra* n.67.

[74]   Tim Summers, Jr., *UPDATE: Council Approves Trilogy for Water Corrosion Study; Emergency Loan to Fund It*, Jackson Free Press, (Apr. 5, 2016), https://www.jacksonfreepress.com/news/2016/apr/05/council-rethinking-trilogy-water-corrosion-study-e/.

[75]   LeBlanc is not an engineer, but another high-ranking individual at the time, Phillip Gibson, was.

[76]   Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, Jackson Free Press, (Mar. 16, 2016), https://www.jacksonfreepress.com/news/2016/mar/16/water-turns-city-wrestles-over-corrosion-study/.

310.    Trilogy determined in a 2017 report that Jackson must have an 8.6 pH at the point of the distribution system and recommends a calibrated hydraulic model.

311.    At that time, there were reports that internal assessments among public officials guessed that there were technical issues with a pump at the O.B. Curtis WTP that "automatically delivers lime feed," which was "used to balance the acidity and alkalinity of the water."[77]

312.    In 2016, it was reported that Jackson had been using solid "lime powder" to treat the water, which had caused "persistent clogging of the underground transportation pipes with the OB Curtis Water Treatment Plant." For that reason, Jackson had shifted away from using the underground pipes and was using above-ground hoses to transport water.[78]

313.    The staff and engineers at Trilogy—particularly Trilogy's chief engineer at that time, Phillip Gibson—were aware of these assessments in 2016.

314.    Indeed, Gibson was previously "discussing possible solutions" with Jackson officials before Trilogy authored the Corrosion Control Plan in 2017, and

---

[77]    Anna Wolfe, *Jackson Water Issues Persist, Lead Levels Down*, Clarion Ledger, (Jun. 2, 2017), https://www.clarionledger.com/story/news/local/2017/07/03/jackson-water-issues-persist-lead-levels-down/437239001/.

[78]    Wolfe, *Ex-Official: Jackson Has Water Solution, Hasn't Acted*, *supra* n.35.

Gibson in fact mentioned that "a switch to liquid lime treatment might alleviate the clogging issue."

315.   Trilogy completed a "desktop" study of the OB Curtis and JH Fewell Water Treatment Plants.

316.   Trilogy recommended that Jackson use soda ash to control corrosion by raising the pH of the water as it left the City's two water treatment plants.

317.   Trilogy recommended the "[c]onversion of both existing lime silos to feed soda ash" at the OB Curtis Water Treatment Plant.

318.   The City followed this recommendation and "retrofit[ted] the liquid lime system into a system which uses soda ash."[79]

319.   As Mayor Lumumba Jr. summarized in 2018: "What we have recently discovered is that the retrofitted system is not an adequate solution to the process. Because we are dealing with a machine that was not intended for the use of soda ash, there has been trouble in terms of soda ash clumping as it leads into the distribution system."[80]

320.   Former Public Works Director Miller would later tell reporters that "the specific challenge faced by the city is that the soda ash being used to control the pH has been particularly difficult to dose in the current system," particularly in light of

---

[79]     Exhibit 2.
[80]     *Id.*

soda ash's reaction with "high levels of humidity in the air" in Mississippi to "form rock-like clumps that are very difficult to process in the system."

321.   In other words, Trilogy had not accounted for the "clumping" of soda ash because of "the Mississippi humidity," which "jams the feed."[81]

322.   Any reasonable water systems engineer would have understood the unique aspects of Mississippi's environment, including the impact of its humidity on different chemicals.

323.   Any reasonable water systems engineer would have understood the challenges and hazards attempting to retrofit a liquid lime-based corrosion control system to a solid soda ash-based corrosion control system—particularly in light of previous internal assessments that the liquid lime system had not been functioning properly.

324.   Trilogy should have understood that these considerations militated in favor of using a liquid lime agent, even if improvements would have been more expensive or improvements to other aspects of the Water Treatment Plant would have been required.

325.   Any reasonable public works director should have understood that these considerations militated in favor of using a liquid lime agent, even if

---

[81]    WQP Magazine, *Jackson, Miss., Issues Drinking Water Advisory* (July 19, 2018), https://www.wqpmag.com/contaminant-removal/jackson-miss-issues-drinking-water-advisory.

improvements would have been more expensive or improvements to other aspects of the Water Treatment Plant would have been required.

326.   Trilogy knew or should have known that soda ash would likely clump and clog the pipes and pumps, thereby jamming the feed and rendering the corrosion control method essentially inoperative and non-functional.

327.   Trilogy knew or should have known that if the corrosion control method was inoperative, it would facilitate the flow of water with a lower pH than necessary to prevent corrosion, thereby increasing the amount of lead that can leach from Jackson's water distribution pipes to leach into Jackson's drinking water.

328.   Trilogy nevertheless recommended a switch.

329.   The City of Jackson, who knew or should have known of the dangers of this plan, agreed to implement the change to soda ash.

330.   In June 2017, "the average pH of the city's water leaving the treatment plant was 7.4—lower than it was in February 2016 when the city began examining the issue."[82]

## XV.   The EPA Issues an Emergency Administrative Order in March 2020.

331.   On March 27, 2020, the EPA Region 4 issued an Emergency Administrative Order.

---

[82]   Wolfe, *Jackson Water Issues Persist, Lead Levels Down*, *supra* n.74.

332.    The Emergency Administrative Order indicates that EPA Region 4 determined that Jackson's public water system has "numerous SDWA violations," including violations of the National Primary Drinking Water Regulations.[83]

333.    The Cover Letter accompanying the Emergency Administrative Order notes that the Order is "[b]ased upon observations made by the EPA during its inspection conducted the week of February 3, 2020 and review of the documents provided by [Jackson] in response to the EPA's request for information …"

334.    The Emergency Administrative Order states that "conditions exist at the system that present an imminent and substantial endangerment to the persons served by the system."

335.    Among the violations was that monitoring equipment had not been repaired or calibrated in three years because a necessary technician position had gone unfilled during that time.

336.    Included in the unrepaired and/or uncalibrated monitoring equipment was pH meters. As a result, "readouts from the continuous pH meters are off by up to 2 units in some instances."

337.    Moreover, Jackson "conducts membrane cleaning cycles without the use of automatic monitoring equipment for pH and chlorine levels … [Membrane cleaning is partially dependent on pH, requiring either higher or lower pH cleaning

---

[83]    Exhibit 1, at 5.

regimes based on the foulants present. The automatic monitoring equipment has been nonfunctional for several years."

338.    However, Jackson did not reveal the Emergency Administrative Order to Jackson's citizens and water users for a year.

339.    Even when the Emergency Administrative Order and related emails and communications were sought pursuant to the Mississippi Open Records Act in the spring of 2021, Jackson resisted disclosing the materials.

340.    Jackson City Council member Ashby Foote observed that "the unwillingness of the city to share with citizens information related to safe drinking water is very troubling."[84]

341.    Foote also said: "An emergency administrative order that was issued by the EPA, which is a formal document with a long list of things that needs to do, and we were not informed that it had been issued. And we had those responsibilities dictated by the EPA. So I was very disappointed when I found out a week ago that this was this has been around for a year, and we had not been notified of it."[85]

---

[84]    AP, *Jackson Won't Release Email About 2020 Water System Problems* (Apr. 19, 2021), https://apnews.com/article/technology-mississippi-jackson-email-environment-360cd6c5d51adec308a635728fb31ae3.

[85]    Kayla Thompson, *Jackson City Council Reacts to EPA Report on City's Water System*, WJTV News, https://www.wjtv.com/news/jackson-city-council-reacts-to-epa-report-on-citys-water-system/.

XVI. **Jackson's Water Is Still Not in Compliance with Federal Law, and the City Has Not Taken Any Serious Steps to Come Into Compliance Over Several Years.**

342.    Jackson's water remains unsafe to this day.

343.    In a May 12, 2021 notice, the City of Jackson admitted to its water users that "[d]uring the monitoring periods of 2018, 2019, 2020, and 2021, we failed to consistently meet treatment technique requirements for our system which is a violation of the Lead and Copper Rule and a requirement of the City's Optimized Corrosion Control Plan."[86]

344.    On or about April 27, 2021, the EPA issued a Notice of Violation to Jackson.[87]

345.    In the April 27, 2021 Notice of Violation, the EPA stresses that in numerous ways Jackson's public water system is currently deficient and not in compliance with federal law.

346.    In particular, the April 27, 2021 Notice of Violation noted that:

"As a result of the June 2015 lead [action level exceedance], the City conducted an optimal corrosion control treatment (OCCT) study between October 2016 and April 2017 and provided the recommended treatment to MSDH on June 13, 2017. MSDH concurred with the recommended treatment and provided a deadline of May 31, 2019 to complete source water treatment

---

[86]    City of Jackson, *Consumer Notice Regarding Your Drinking Water*, attached hereto as Exhibit 6 and incorporated as if fully stated herein.

[87]    Letter from Carol Kemker, Director, EPA Region 4 Enforcement and Compliance Assurance Div., to the Hon. Chokwe A. Lumumba, Mayor of the City of Jackson re Notice of Noncompliance (Apr. 27, 2021), attached hereto as Exhibit 7 and incorporated as if fully stated herein.

installation. Although MSDH later extended the completion date to December 2019, this deadline has remained unmet throughout 2020 and into 2021, and the City has failed to install OCCT at the J.H. Fewell WTP as of the date of this Notice."

347.   Jackson is currently under an EPA emergency order, meant to prevent "an impending dangerous condition from materializing or reduce or eliminate a dangerous situation."

348.   Jackson has persistently failed to employ sufficient trained staff at its water treatment facilities is partially responsible for the City of Jackson's failure to provide safe drinking water.[88]

349.   For example, as of June 29, 2021, "there [were] only two full-time operators and one part-time operator at O.B. Curtis and five at J.H., compared to about 12 total in past years."[89]

350.   Mayor Lumumba Jr. is aware of the staffing shortfalls and has the power to ensure that sufficient staff are available.

---

[88]    Wilson, *supra* n.63; Nick Judin, *EPA Tours Jackson Water Treatment Plants As City Faces Long Road To Rehab*, Mississippi Free Press (July 26, 2021), https://www.mississippifreepress.org/14050/epa-tours-jackson-water-treatment-plants-as-city-faces-long-road-to-rehab/.

[89]    Justin Vicory, *EPA and Jackson Mayor's Office Have a Plan for Fixing City's Long-Running Water Woes*, Clarion Ledger, https://www.clarionledger.com/story/news/2021/06/30/councilmembers-study-epa-mayors-plan-fix-jacksons-water-system/7794448002/.

351.    However, Mayor Lumumba Jr. has consistently not taken appropriate actions to ensure that sufficient staff are available to provide Jackson's citizens with clean and safe drinking water.

352.    Ultimately, "[s]ince the 2015 and 2016 lead exceedances, EPA identified 1,476 days during which the city failed to comply with 'proper treatment technique requirements.'"[90]

353.    "Put another way, over the last five-and-a-half years, the city's drinking water hasn't met the minimum quality requirements for four of those years."[91]

## XVII. Lead's Devastating Health Effects and Other Personal Injuries Caused by Jackson's Water Crisis.

354.    Lead is a toxic metal that causes severe health consequences.

355.    Lead's catastrophic effects are indisputable. According to the EPA,

"[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults. A dose of lead that would have little effect on an adult can have a significant effect on a child. In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."

356.    According to the World Health Organization,

---

[90]    Judin, *supra* n.85.

[91]    Lee O. Sanderlin, *'We See the Threat:' EPA Gives Jackson Timeline to Begin Addressing City's Water Issues*, Mississippi Clarion Ledger (July 22, 2021), https://www.clarionledger.com/story/news/2021/07/22/environmental-protection-agency-jackson-miss-water-issues/8056918002/.

"lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible."

357.   The behavioral effects of lead poisoning in children cannot be overstated. According to many of the leading researchers on lead, increased lead levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors, and arrests, including arrests involving violent offenses.

358.   Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

359.   The effects of lead exposure are long lasting. The EPA has explained:

"Lead can accumulate in our bodies over time, where it is stored in bones along with calcium. During pregnancy, lead is released from bones as maternal calcium and is used to help from the bones of the fetus. This is particularly true if a woman does not have enough dietary calcium. Lead can also cross the placental barrier exposing the fetus to lead. This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

360.   Lead is also harmful to adults. The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)."

361.   The costs of lead poisoning are real and substantial. It has been estimated that each case of childhood lead poisoning leads to $5.9 million in medical care costs over the course of appropriate treatment.[92]

362.   The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning (typically chelation therapy), as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

363.   Given the long-lasting risks of lead exposure and the potential for lead sediment to be disturbed and re-mobilized into the water system, Plaintiffs will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

364.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered extreme emotional distress.

## XVIII.    Lost Income Potential of Jackson's Children.

365.   Jackson's most vulnerable, its children, have suffered the most disastrous consequences from lead exposure—diminished potential over the entire course of their lives.

---

[92]    Leonardo Trasande & Yinghua Liu, Reducing The Staggering Costs Of Environmental Disease In Children, Estimated At $76.6 Billion In 2008, Health Affairs, 30, no.5 (2011): 863-70.

366. The World Health Organization states that "[t]hese costs are sometimes referred to as lost opportunity costs . . . When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

367. Notably, this estimate is conservative as it relates solely to lost earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

368. Other researchers have estimated the economic impact of childhood lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure.[93]

369. As a direct and proximate result of Defendants' conduct, Jackson's children, including each Plaintiff, have suffered specific, measurable damages in the form of lost earning potential. They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services and related education assistance programs.

---

[93]    Trasande & Liu, *supra* n.89.

**XIX. The Plaintiffs.**

370.    Plaintiffs were all born between 2003 and 2021.

371.    Plaintiffs have, at all material times, lived in the City of Jackson.

372.    The homes in which Plaintiffs reside are each connected to Jackson's public water system; Plaintiffs' households receive drinking water from Jackson's public water system.

373.    At all relevant times, Plaintiffs regularly drank tap water at home.

374.    At all relevant times, Plaintiffs regularly ate food washed, cooked, and/or otherwise prepared using Jackson's tap water.

375.    Throughout the relevant time period, Plaintiffs were never aware of the latent lead hazards lurking in the tap water.

376.    At no time was any faucet in Plaintiffs' households equipped with a water filter adequate to protect them from the lead in Jackson's water.

377.    After the MSDH and City of Jackson issued boil notices, Plaintiffs drank tap water after it was boiled.

378.    Plaintiffs have been diagnosed with elevated blood-lead levels, meaning each Plaintiff was lead-poisoned.

379.    Plaintiffs are already exhibiting the effects of lead-poisoning. Plaintiffs suffer from cognitive deficits; behavioral issues; difficulty focusing; difficulty completing schoolwork, chores, and/or other tasks; and has other emotional issues.

103

380.   Each of these issues was caused by exposure to lead from Jackson's tap water during the relevant time period.

381.   Plaintiffs will continue to manifest new and worsening symptoms in the future and will face a lifetime of hardship, decreased earning capacity, and emotional distress.

## CLAIMS FOR RELIEF

### COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY AGAINST DEFENDANTS THE CITY OF JACKSON, LUMUMBA JR., YARBER, POWELL, MILLER, SMASH, CRAIG, AND JOHN DOES 1 THROUGH 40

382.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

383.   Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

384.   The conduct of Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

385.   Defendants were aware that their conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity.

386.   Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs.

387.   Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

388.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Complaint, Plaintiffs have suffered violations of Plaintiffs' fundamental right to bodily integrity, property, and liberty interests, including, but not limited to:

    a.    Serious and in some cases life-threatening and irreversible bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.    Pain and suffering;

    d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

389.   The conduct of Defendants was both reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT II: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER AGAINST DEFENDANTS THE CITY OF JACKSON, LUMUMBA JR., YARBER, POWELL, MILLER, SMASH, CRAIG, AND JOHN DOES 1 THROUGH 40

390.    Plaintiffs incorporates by reference all preceding allegations set forth above as if fully stated herein.

391.    Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

392.    Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making Plaintiffs more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

393.    Defendants, while acting under color of state law, affirmatively continued, increased, and perpetuated the dangers, risks of harm and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited, and ignored said known dangers and risks of harm to which they exposed Plaintiffs making Plaintiffs more vulnerable to said dangers.

394.    Defendants were aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

395.    This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

396.    The dangers and risks of harm were discreet and special to each Plaintiff, as a Jackson water user, and not risks affecting the public at large.

397.    The dangers and risks of harm to Plaintiffs from the ongoing exposure to the water toxins which were created and perpetuated by Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

398.    These actions of Defendants constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional, and economic harm to Plaintiffs.

399.    As a direct and proximate result of the unconstitutional acts of Defendants as alleged herein, Plaintiffs have suffered violations of Plaintiffs' fundamental rights to bodily integrity, property, and liberty interests, including, but not limited to:

   a.  Serious and in some cases life-threatening and irreversible bodily injury;

107

    b.     Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.     Pain and suffering;

    d.     Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

400.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### COUNT III: NEGLIGENCE
### AGAINST DEFENDANTS THE CITY OF JACKSON, LUMUMBA JR., YARBER, POWELL, MILLER, SMASH, MSDH, CRAIG, AND JOHN DOES 1 THROUGH 40

401.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

402.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 all owed a duty to exercise reasonable care on behalf of Jackson's citizens and water users.

403.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1

through 40 all undertook, for consideration to perform a duty owed to Plaintiffs by the City of Jackson and/or State of Mississippi.

404.   Based on their undertakings, Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 had a duty to Plaintiffs to exercise reasonable care to protect that undertaking.

405.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 to exercise reasonable care to protect that undertaking.

406.   Plaintiffs relied on the Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 to exercise reasonable care to ensure the provision of, and proper treatment for, safe drinking water drawn from the Jackson public water system's various water sources.

407.   Plaintiffs relied on Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig,

and John Does 1 through 40 to exercise reasonable care to disclose known hazards in their drinking water.

408.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 failed to exercise reasonable care.

409.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 breached their duties to Plaintiffs in ways including but not limited to the following:

   a.  Failure to require appropriate corrosion control treatment;

   b.  Failing to install, have, maintain, and repair appropriate corrosion control equipment and methods;

   c.  Switching the City of Jackson's water to a new source without performing appropriate studies to determine if it was safe under the circumstances;

   d.  Failing to warn Jackson's citizens and water users that the City was switching water sources to a source with a much lower pH that would cause lead to leach into drinking water;

   d.  Failing to require proper testing of Jackson's water at the O.B. Curtis and J.H. Fewell Water Treatment Plants;

   e.  Failing to conduct proper testing of Jackson's water at the O.B. Curtis and J.H. Fewell Water Treatment Plants;

    f.  Failing to require proper testing of Jackson's drinking water;

    g.  Failing to conduct proper testing of Jackson's drinking water;

    h.  Failing to have, maintain, and repair properly functioning equipment capable of monitoring appropriate pH levels;

    i.  Stating that appropriate corrosion control equipment was in

    j.  Representing that the water was safe to drink when it was really not safe to drink;

    k.  Ignoring evidence that Jackson's water was unsafe to drink;

    l.  Withholding information that showed that Jackson was not taking steps to ensure its water was safe to drink;

    m.  Withholding information that showed that Jackson's water was unsafe to drink; and

    n.  Failing to warn Plaintiffs that Jackson's water was not safe to drink.

410.  Plaintiffs suffered harm resulting from the failures to exercise reasonable care of Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40.

411.  Plaintiffs suffered harm from the failure to exercise reasonable care to protect their undertakings of Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40.

412.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 failures to exercise reasonable care to protect their undertakings proximately caused the Plaintiffs' injuries and were entirely foreseeable.

413.   All of the Defendants' conduct and/or failures to act constitute gross negligence and recklessness because the conduct and/or failures to act demonstrate a deliberate disregard of a known risk and a substantial lack of concern for whether injury would result.

414.   Defendants' acts and/or omissions were the proximate cause of the Plaintiffs' injuries.

415.   As a direct and proximate result of the above Defendants' negligent and/or reckless conduct, Plaintiffs have suffered past and present personal injuries, and will with reasonable certainty suffer future personal injuries, including but not limited to: lead poisoning, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, and various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems).

416.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 are liable to Plaintiffs for all harms resulting from Defendants' failures to exercise reasonable care.

417.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 acted in the course and scope of their employment.

418.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, MSDH, Craig, and John Does 1 through 40 are not immune from suit under Miss. Code Ann. § 11-46-5(1), and no exception in Miss. Code Ann. § 11-46-9 applies.

419.    Plaintiffs served notices of negligence claims pursuant to Miss. Code Ann. § 11-46-11(3) on or about October 18, 2021.

## COUNT IV: PROFESSIONAL NEGLIGENCE
## AGAINST TRILOGY

420.    Plaintiffs incorporates by reference all preceding allegations set forth above as if fully stated herein.

421.    Trilogy undertook, for consideration, to render services for the City of Jackson, which they should have recognized as necessary for the protection of each Plaintiff.

422.    Trilogy undertook, for consideration, to perform a duty owed to Plaintiffs by the City of Jackson and/or MSDH.

423.    Based on its undertaking, Trilogy had a duty to Plaintiffs, as residents and water users in the City of Jackson, to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by professionals, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment for treating Jackson's source of drinking water.

424.    Trilogy also owed a duty to Plaintiffs to notify the proper authorities of unethical illegal practices of others whose actions or decisions posed threats to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when treating Jackson's drinking water.

425.    Plaintiffs relied on Trilogy to perform the duty to inspect the City's water treatment system, as well as its sources and corrosion control methods, to make sure that it was safe.

426.    Trilogy failed to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by professionals.

427.    Indeed, Trilogy failed to use even reasonable care.

428.    Plaintiffs suffered harm resulting from Trilogy's failures to exercise reasonable care to protect Plaintiffs in its undertaking.

429.    Trilogy's failures to exercise reasonable care to protect Plaintiffs directly and proximately caused the Plaintiffs' injuries and were entirely foreseeable.

430.    As a direct and proximate result of Trilogy's actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including, without limitation, hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity.

431.   Trilogy's conduct and/or failure(s) to act constitute gross negligence because it was so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

432.   Trilogy's conduct evinces actual malice and/or gross negligence which evidences a willful, wanton, or reckless disregard for the safety of others, and so Plaintiffs is entitled to an award of punitive damages.

## COUNT V: NEGLIGENCE
## AGAINST TRILOGY

433.   Plaintiffs incorporates by reference all preceding allegations set forth above as if fully stated herein.

434.   Trilogy undertook, for consideration, to render services for the City of Jackson, which they should have recognized as necessary for the protection of each Plaintiff.

435.   Trilogy undertook, for consideration, to perform a duty owed to Plaintiffs by the City of Jackson and/or MSDH.

436.   Based on its undertaking, Trilogy had a duty to each Plaintiff, as a resident and water user in the City of Jackson, to exercise a reasonable degree of care, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment for treating Jackson's source of drinking water.

437.   Trilogy also owed a duty to Plaintiffs to notify the proper authorities of unethical illegal practices of others whose actions or decisions posed threats to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when treating Jackson's drinking water.

438.   Plaintiffs relied on Trilogy to perform the duty to inspect the City's water treatment system, as well as its sources and corrosion control methods, to make sure that it was safe.

439.   Trilogy failed to exercise that degree of reasonable care.

440.   Plaintiffs suffered harm resulting from Trilogy's failures to exercise reasonable care to protect Plaintiffs in its undertaking.

441.   Trilogy's failures to exercise reasonable care to protect Plaintiffs directly and proximately caused the Plaintiffs' injuries and were entirely foreseeable.

442.   As a direct and proximate result of Trilogy's actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including, without limitation, hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses,

wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity.

443.   Trilogy's conduct and/or failure(s) to act constitute gross negligence because it was so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

444.   Trilogy's conduct evinces actual malice and/or gross negligence which evidences a willful, wanton, or reckless disregard for the safety of others, and so Plaintiffs are entitled to an award of punitive damages.

### DEMAND FOR JURY TRIAL

445.   Plaintiffs demand trial by jury in this action of all issues so triable.

### RELIEF REQUESTED

446.   Plaintiffs demand judgment against Defendants for:

    a.  Compensatory damages;

    b.  Punitive damages;

    c.  Exemplary damages;

    d.  Pre-judgment and post-judgment interest;

    e.  Attorneys' fees and litigation expenses; and

    f.  Any other relief the Court deems appropriate.

Dated: April 10, 2023

Respectfully submitted,

**LEVY KONIGSBERG LLP**

/s/ Corey M. Stern
Corey M. Stern, *PHV* 49568
John P. Guinan, *PHV* 49681
Melanie Daly, *PHV* 49758
605 Third Ave., 33rd Fl.
New York, New York 10158
(212) 605-6200
cstern@levylaw.com
jguinan@levylaw.com
mdaly@levylaw.com

-and-

**CHHABRA & GIBBS, P.A.**

/s/ Rogen Chhabra
Rogen Chhabra
Darryl Gibbs
120 North Congress Street, Ste. 200
Jackson, Mississippi 39201
(601) 948-8005
rchhabra@cglawms.com

*Attorneys for the Plaintiffs*